UNITED STATES of America, Appellee,

v.

Edward B. ELLIS, a/k/a Rocco Ellis, Defendant, Appellant.

No. 90–1698.

United States Court of Appeals, First Circuit.

Heard Dec. 4, 1990.

Decided May 31, 1991.

Morris M. Goldings with whom Mahoney, Hawkes & Goldings was on brief, for defendant, appellant.

Stephen A. Higginson, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief, for the U.S.

Before BREYER, Chief Judge, CAMPBELL and CYR, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Edward B. Ellis appeals from his May 14, 1990 conviction, after a jury trial in the United States District Court for the District of Massachusetts, of three counts of knowingly transporting "ED," an individual under the age of eighteen years, in interstate commerce between Massachusetts and Florida (twice) and Massachusetts and Vermont (once) to engage in illegal sexual activity, in violation of 18 U.S.C. § 2423.[1] Ellis was sentenced to twenty five years in prison. We affirm.

## FACTS

The following appeared at trial:

1. Catherine DeCouto met Edward "Rocco" Ellis in 1985, while Ellis was serving a state prison sentence. They con-

---

1. 18 U.S.C. § 2423 imposes a fine or imprisonment for not more than ten years, or both, upon "[w]hoever knowingly transports any individual under the age of 18 years in interstate or foreign commerce ... with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense ..."

ceived a daughter, "LM," who was born in June of 1986. After his release from jail, Ellis moved in with Catherine, who was also the mother of ED, who was then five years old. They originally lived in North Adams, Massachusetts, and they later moved to New Ashford, Massachusetts.

2. ED testified that shortly after Ellis came to live with them, he began to abuse her sexually. (ED was seven years old at the time.) She said that the first time occurred during an overnight trip to Boston, where Ellis traveled to pick up teddy bears for Catherine's gift shop located in North Adams. ED described how Ellis used to put his fingers inside her vagina, and that he told her never to tell, or he would hurt her mother, her grandmother, or take her baby sister, LM, from her. She described how the assaults occurred frequently in various places where they had lived, and that on one occasion Ellis had assaulted her in Catherine's shop in the Mohawk Theater, which Ellis formerly owned.

3. ED testified that Ellis forced her to perform fellatio upon him, and that he performed cunnilingus upon her. ED said that on at least one occasion, she refused to perform oral sex on Ellis, so he spanked her until her buttocks reddened. She stated that Ellis then photographed her in that condition, and she identified a photograph which had been found during a search of the defendant's home which corroborates that assault. On another occasion (his birthday), when she resisted being touched inside her vagina, she remembered him telling her that "it was half my fault," and that no one would believe her if she told on him. ED also remembered him putting not only his fingers in her vagina, but also his toes and his tongue; and he forced her to touch his penis. When asked how often he did these things to her, ED said "a lot," and "sometimes he would do it just once a week or more than once a week." She said it happened at their home in the Berkshires, at the beach in Provincetown, in Boston, in Ellis' truck-camper, and at her mother's North Adams ice cream shop. ED also identified numerous photographs of her sister, LM, unclothed, several of which were taken in Florida by the defendant.

4. Both ED and her mother, Catherine, testified Ellis drove them to Florida on two separate occasions in his truck-camper. Catherine confirmed that the two trips to Florida were at Christmas of 1987 and in late February or early March of 1988. The first trip to Florida was a family vacation. ED testified that she sat in the front seat of the truck-camper, being forced to touch Ellis' penis and having him touch her vagina, yet being too frightened to tell her mother who was often sleeping with LM in the camper attachment. Once in Florida, Ellis continued to sexually abuse her. A few months later, in February or March 1988, the entire family again went to Florida, this time for the purpose of moving, since Ellis and Catherine were going to operate a restaurant that Ellis had purchased. Ellis remained in Florida for about a week or so, then returned to Massachusetts to run another business. The rest of the family stayed in Florida until returning to Massachusetts in May. ED said that the assaults in Florida consisted of oral sex, fondling, and the insertion of the defendant's fingers and toes into her vagina, and that they continued throughout the duration of their Florida trips.

5. ED also testified that after returning from the second Florida trip some time in 1988, the defendant drove her in the truck-camper from the Berkshires to Vermont, where she remembered seeing a "Welcome to Vermont" road sign. She said they stopped at a picnic area, and the defendant took her into the back of the truck-camper, where he sexually assaulted and threatened her.

6. Catherine DeCouto testified that ED appeared reluctant to be left alone with Ellis, but that she mistakenly believed that ED was being disobedient. She said Ellis routinely belittled ED, calling her "pig," "moron," "slut" and that he once said to ED, "I hope you get AIDS and die!" ED said that she was afraid of the defendant and that Ellis often called her names, including "fatso," "stupid" and "whore," and that he was "mean to me." ED said that

the last time Ellis hurt her was on his birthday in April of 1989, and that she threatened to tell her mother about the abuse at that time. Ellis said, "Go ahead, I'll just say that you started it." She also testified that she observed Ellis insert his fingers inside LM's vagina on one occasion.

7. Ronald Romano, who has been a friend of the defendant since 1973 and is LM's godfather, said that Ellis once forced ED to dance for him after she, at first, refused, and that the child had a look of terror on her face as she reluctantly complied with Ellis' demands. He also testified that ED was treated differently from LM by Ellis, that ED was called names by the defendant, and that at times he was afraid of Ellis.

8. Robert Andrews, a friend of the defendant since their joint incarceration at MCI–Cedar Junction, testified that on or about November 11, 1989, Ellis wrote to him from jail, admitting that there were two incidents with ED, but that she had initiated them and that these incidents were part of the child's "growing process."

9. Catherine DeCouto and Sean Sullivan testified that the abuse came to light in June of 1989 when ED, while brushing sand from her shorts during play on a Provincetown beach, was overheard by Sullivan saying suddenly, "No, no, don't go up there! I'm too young." When Sean told Catherine about the strange remark, Catherine confronted ED who admitted that Ellis had touched her and went on to describe what had happened. ED first insisted no, but then tearfully, with her hands on her stomach, and becoming sick, said that Ellis had molested her. During the conversation, both mother and daughter were sick, and Catherine estimated that the full outburst and admission "came out over the course of a couple of hours."

10. Catherine DeCouto testified that at first she could not believe it, because she loved the defendant and trusted him. She said that about one week later ED told her mother not to touch her feet because "he does that." Catherine testified that she then realized that what ED had told her was true, since Ellis used to hold Catherine's feet during intercourse and perform intercourse upon her with his toes.

11. Shortly after ED's disclosure to her mother, Catherine reported the abuse to the Massachusetts Department of Social Services ("DSS") and to law enforcement authorities. Marilyn Reedy, a DSS social worker, testified that she interviewed ED and LM in July of 1989, and that LM demonstrated touching of her vaginal area by the defendant using anatomical dolls. Reedy was not allowed to testify as to what ED told her as to Ellis' actions.

12. Edward Ellis was arrested on August 25, 1989 by special agents of the FBI and the Massachusetts State Police. On September 6, 1989, the federal grand jury returned a three-count indictment charging him with having violated 18 U.S.C. § 2423.[2] The three counts were as follows:

Count one—that in or about December of 1987, in Massachusetts and Florida, he knowingly transported ED, an individual under the age of eighteen, between Massachusetts and Florida, with intent that ED engage in sexual activity for which Ellis could be charged with a criminal offense, specifically "Rape and Abuse of a Child under Sixteen" in violation of Mass.Gen. Laws ch. 265, § 23; "Capital Sexual Battery of a Child under Twelve" in violation of Florida Statute § 794.011(2); and "Lewd, Lascivious and Indecent Assault upon a Child" in violation of Florida Statute § 800.04, all in violation of Title 18, United States Code, Section 2423.

Count two—an identical charge for transportation in or about February of 1988; and

Count three—an identical charge for transportation between Massachusetts and Vermont, involving alleged violations of Vermont as well as Massachusetts law, in or about March through in or about October of 1988.

2. Ellis was also charged under Massachusetts law with rape and abuse of a child (no force), and these charges are pending in the Berkshire County Superior Court.

13. On May 14, 1990, Edward Ellis was found guilty by the jury on all three counts.

14. During sentencing, the government urged the court to depart upwards to the maximum statutory sentence of 360 months. As grounds to do so, the government cited Ellis' abuse of trust, his criminal record, his obstruction of justice, the psychological injury to ED, and the extreme nature of Ellis' conduct. Ellis' counsel, in response, noted the damage already inflicted on the family, and urged the court to adopt the lowest permissible punishment under the Guidelines, 188 months. Speaking on his own behalf, Ellis promised love to his family and criticized his prosecution. Finding that Ellis' conduct had been "heinous, cruel, brutal and degrading, and that there was likelihood that ED will be psychologically scarred for the rest of her life," the court departed upwards 65 months from the upper limit provided in the Guidelines, imposing three successive sentences of 100 months (25 years).

## I. *JURY INSTRUCTIONS*

█ Ellis challenges the court's instructions that the jury could convict if it found that *one* of Ellis' several motives or purposes for the particular interstate trip was to have ED engage in criminal sexual activity.

The court charged:

You may find that this element [the intent element] has been satisfied if you are persuaded that defendant's intent was to have ED engage in criminal sexual activity, and *that was one of the several motives or purposes for the trip*. To put it another way, the Government must prove that the defendant's immoral purpose was *not a mere incident of the trip*

or trips, but instead was at least one of the defendant's motivations for taking the trip in the first place. [Emphasis supplied.]

Ellis contends the court erred in rejecting his proffered alternative charge that *"the dominant purpose* of the transportation must be the intent to engage in sexual activity with the minor." Ellis points to the Supreme Court's holding in *Mortensen v. United States*, 322 U.S. 369, 64 S.Ct. 1037, 88 L.Ed. 1331 (1944), construing an earlier Mann Act provision that preceded the present 18 U.S.C. § 2421.[3] In *Mortensen* the owners of a bordello allowed two of their prostitutes to accompany them on an innocent vacation to another state, from which all returned to pursue business as usual at the house of ill fame. Prosecuted under the Mann Act for the return journey, the defendants won their case on the ground that the interstate travel was wholly unrelated to the prostitution. The Court said,

The statute thus aims to penalize only those who use interstate commerce with a view towards accomplishing the unlawful purposes. To constitute a violation of the Act, it is essential that the interstate transportation have for its object or be the means of effecting or facilitating the proscribed activities. *Hansen v. Haff*, 291 U.S. 559, 563 [54 S.Ct. 494, 495, 78 L.Ed. 968 (1934)]. An intention that the women or girls shall engage in the conduct outlawed by § 2 must be found to exist before the conclusion of the interstate journey and must be the dominant motive of such interstate movement.

322 U.S. at 374, 64 S.Ct. at 1040.[4]

Seven years after *Mortensen*, this Circuit reviewed a district court's instruction

---

**3.** Ellis was not charged under § 2421 but under a companion provision relating solely to minors, 18 U.S.C. § 2423. See note 1, *supra.*

**4.** The statute allegedly violated in *Mortensen* proscribed the knowing transportation in interstate commerce of "any woman or girl for the purpose of prostitution or debauchery ... or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute...." Act of June 25, 1910, § 2, 36 Stat. 825, 18 U.S.C. § 398 (since rescinded). The

current successor to that statute, 18 U.S.C. § 2421, no longer uses the word "purpose" at all and has been broadened to reach beyond commercial prostitution and the "white slave traffic" which were the main targets of the Mann Act. *Mortensen*, 322 U.S. at 377, 64 S.Ct. at 1041; *see Cleveland v. United States*, 329 U.S. 14, 17, 67 S.Ct. 13, 15, 91 L.Ed. 12 (1946). The question arises whether *Mortensen's* focus on the purpose of the interstate transportation still remains controlling. *See infra.*

that the jury could convict so long as it found that "one of the purposes" of the interstate transportation was an immoral one. *Daigle v. United States*, 181 F.2d 311, 313–14 (1st Cir.1950). Notwithstanding *Mortensen's* language on "the dominant motive," we upheld the instruction. Both before 1950 and thereafter many other circuit courts took the same position, namely, that it was enough if *one* of the efficient purposes of the interstate transportation was to engage in the outlawed activity.

Thus the Seventh Circuit said that, "to sustain a conviction under the Mann Act it is not necessary that the sole purpose of the transportation be for immoral purposes, it being sufficient if it was a dominant or an efficient and compelling purpose." *United States v. Snow*, 507 F.2d 22, 23–24 n. 2 (7th Cir.1974). *See also United States v. Drury*, 582 F.2d 1181, 1185–1186 (8th Cir.1978); *United States v. Kotakes*, 440 F.2d 342, 345–346 (7th Cir. 1971), *cert. denied*, 403 U.S. 919, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971); *Forrest v. United States*, 363 F.2d 348, 349–351 (5th Cir.1966), *cert. denied*, 386 U.S. 995, 87 S.Ct. 1315, 18 L.Ed.2d 343 (1967).

Appellant urges us to reconsider *Daigle* as being inconsistent with the Supreme Court's venerable pronouncements in *Mortensen* and elsewhere on dominant motive. We are not persuaded. Quite apart from the 40 years that have elapsed since *Daigle*, and its widespread acceptance, we believe *Daigle's* reasoning to be sound and not inconsistent with *Mortensen*. As the *Daigle* court pointed out, there was in *Mortensen* a total lack of evidence of any purpose for the interstate journey "other than the innocent one of giving them [the women] a deserved vacation from their work as prostitutes in their bawdy house...." 181 F.2d at 314. Thus the Court had no reason to consider the question of multiple purposes. *Id.* It is true that the language in *Mortensen* alluding to a single dominant purpose was repeated in a footnote in *Hawkins v. United States*, 358 U.S. 74, 79 n. 6, 79 S.Ct. 136, 139 n. 6, 3 L.Ed.2d 125 (1958), but in *Hawkins* the Court was concerned with a very different issue. No more than

*Mortensen* itself does *Hawkins* contradict *Daigle* on the narrow issue of interstate journeys involving several motives.

In the present case, as in *Daigle*, the district court did not instruct, in so many words, that the jury must find that illicit sexual conduct was one of the journey's several *dominant* purposes. But, as the *Daigle* court held, the word "dominant" is not essential if the same thought is otherwise conveyed. 181 F.2d at 314. The district court sufficiently met the requirements of *Mortensen*, as interpreted in *Daigle*, by requiring that criminal sexual activity be "one of the several motives or purposes ... not a mere incident of the trip or trips, but instead was at least one of the defendant's motivations for taking the trip in the first place."

It should be remembered that Ellis' request was for the court to charge that criminal sexual activity must be *the* dominant motive. That charge would have been too restrictive in this situation and was properly rejected. When handed an erroneous instruction, a court is not required to correct it into some form maximally pleasing to the offeror (i.e. "*a* dominant motive"), but may stay with its own preferred alternative, if correct. *See United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.), *cert. denied*, 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984).

We accordingly reject appellant's contention that the jury charge was erroneous.

## II. *SUFFICIENCY OF EVIDENCE*

■ Ellis argues that, even if the charge was correct, the jury could not reasonably infer that one of the purposes of his trips from Massachusetts to Florida and from Massachusetts to Vermont was to facilitate criminal sexual activity between himself and ED. The evidence was overwhelming that Ellis engaged repeatedly in sexual activity with ED whether they were in Massachusetts, whether they were traveling in his camper, or whether they were in Florida or Vermont. Hence, the argument goes, his abuse of ED was wholly incidental to his interstate transportation of her.

We disagree. First, Ellis' intent to engage in illegal sexual activity *before* the conclusion of the interstate journey was abundantly clear. *Compare Mortensen,* 322 U.S. at 374, 64 S.Ct. at 1040. And the evidence suggests to some degree that ED was particularly, although not exclusively, vulnerable when the family was traveling in the camper.

More important, however, the jury could consider not only the family's purpose in taking the interstate trips but Ellis' private motive for wanting to bring the victim along, that is to say, his motive in transporting *her.* Even if vacationing, or business, or other objectives, prompted the trips, the jury was entitled to find on this record that at least one of Ellis' personal motives for bringing along ED was to have her available so that he could sexually abuse her during and after the trips. In *Daigle* we said that evidence of specific instances of sexual immorality indulged in by the accused and the woman or girl alleged to have been transported, if proximate enough in point of time, is relevant on the issue of the purpose or intent of the transportation. 181 F.2d at 313. Here the evidence of numerous illicit sexual acts both during the interstate journeys and within the destination state, permit an inference that one of defendant's purposes in transporting ED was to have her continuously available to commit such acts. *Id.* As in *Daigle,* it can be said that,

> this is not a case in which the government relies entirely upon evidence of a moral dereliction at the end of an interstate trip to sustain a conviction under the statute in the face of direct evidence that the trip was originally undertaken for some innocent purpose, with the result that on all the evidence it would be as probable as not that the moral dereliction at its termination was an afterthought, or a mere casual incident, of an otherwise innocent interstate journey.

*Id.*

True, ED's accompaniment of Ellis may have been inevitable in that, being only seven or eight years old, and with her mother also on the trips, there was little else she could do but come along. But we think that a reasonable jury could still conclude, given Ellis' repeated assaults, that her availability for abuse was one of the incentives for him to bring her with him, hence one of his motives for the interstate transportation. It would be ironic to hold that, because ED was too small, weak and dependent to be left by herself, her abusive transportation could only be viewed as incidental.

We uphold the conviction, therefore, under traditional Mann Act analysis. We could more easily uphold it, however, on the ground that the plain language of the relevant statute, 18 U.S.C. § 2423, no longer uses the terms "purpose" or "motive" in describing the offense. Rather the modern statute penalizes one who "knowingly transports any individual under the age of 18 years in interstate commerce ... *with intent that* such individual engage in prostitution, or in [illegal] sexual activity ..." (Emphasis supplied.) Gone is the reference to purpose and the predominant emphasis on commercial prostitution that were features of the differently-worded statute construed by the Court in *Mortensen* in 1945. *See* note 4 *supra.* The most recent version of the law is a product of the 1986 Child Sexual Abuse and Pornography Act, Pub.L. No. 99–628, § 5(b)(1), Nov. 7, 1986, 100 Stat. 3511 (1986). In amending the Mann Act at this time, legislators mentioned their intention to eliminate any requirement that the transportation be for illicit conduct shown to be commercially exploited; pedophiles, they said, often acted for purposes of sexual gratification, with no money traded. 132 Cong.Rec. 145, S17296 (daily ed. October 18, 1986) (statement of Senator Roth). A primary intent was to "place these individuals [pedophiles] within the reach of the Mann Act." *Id.* It would be difficult to imagine conduct more clearly within the ambit of Congress's intention than Ellis'.

Both the plain language of the current law, under which Ellis was prosecuted, and the legislative history are consistent, therefore, with his conviction under § 2423. One need go no further, indeed, than the current language. This requires only the

knowing transportation of the minor "with the intent that" he or she engage in illegal sexual activity. Neither the purpose of, nor motive for, the transportation (to the extent these might go beyond an actor's simple intent) are mentioned in the current law. Applying the statute as it reads, the evidence clearly sufficed to prove that Ellis harbored the intent that ED engage in illicit sexual activities with him when he transported her. As the Supreme Court has said, "When confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning." *TVA v. Hill*, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1977). *See also Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985).

Neither the Supreme Court nor any other circuit has yet, however, addressed the question of whether and to what degree the 1986 redraft undercuts traditional Mann Act precedent focusing on the one or more purposes of the interstate travel. Here the district court instructed in the traditional language of purpose and motive. Since Ellis' conviction stands even under this somewhat narrower and more stringent approach, we affirm under that rationale, and leave for another day a determination of whether the "purpose" requirements set out in *Mortensen* and refined in *Daigle* (to the extent more stringent than the current "intent" language), are still operative.

### III. *ADMISSIBILITY OF MOTHER'S TESTIMONY OF WHAT ED TOLD HER*

During the trial Ms. DeCouto testified on direct examination about the first conversation she had with her daughter about Ellis' sexual assaults. She testified that after a friend had told her that he thought that ED had been molested, she approached ED to inquire about the possibility of sexual molestation. Over Ellis' objections, Ms. DeCouto stated:

A: I asked her [ED] if anybody had ever touched her in her private parts. And her first response was no. And I sat and looked at her and she started to cry. She had her hands on her stomach. Her face was all—her face was all—she was just tearing. Holding onto herself.

And I got down by her knees, and I said to her: If somebody has touched you, ED, I have to know. I have to know what they have done. And it's not your fault if somebody has. And there are good touches and bad touches and you know the difference. And I need to be able to help you.

Q: What did she say and do?

A: ED said that yes, he touched me. And I looked at her and I said: He who? And she said: Rocco....

Q: Did she tell you at that point what kind of touch specifically?

A: She told me that he used his fingers inside of her. I asked her when, and she started to tell me that it happened at Ellie McClusky's house, it happened in New Ashford at the theater. Happened on trips. She went on to say after that that he had made her put her mouth on his penis. And that he had given her oral sex. That he had threatened her.

Q: What did she tell you he threatened to do?

A: She said that he had threatened to kill me. He had threatened to kill her grandparents. He had threatened to stab her.

Q: Did this come out all at once?

A: No, it came out over the course of a couple of hours.

Over objection, the court allowed this testimony into evidence without elaborating on the grounds for its admission. Ellis now protests that this conversation was hearsay, and should not have been admitted. During trial, and now also on appeal, the government had advanced two theories under which Ms. DeCouto's testimony could be admitted: under the "excited utterance" exception to the hearsay rule, Fed.R.Evid. 803(2), or, in the alternative, under the exception for statements made for purposes of medical diagnosis or treat-

ment, Fed.R.Evid. 803(4).[5] Defendant vigorously denies that either theory fits.

We need not enter the dense thicket of whether the evidence was admissible under either of these theories. *See* Capra, *Innovations in Prosecuting Child Sexual Abuse*, N.Y.L.J., November 9, 1989, at 3 (Prosecution of the crime of sexual abuse of a child poses special evidentiary problems. The traditional hearsay exceptions are not drafted with child sex abuse prosecutions in mind.); Note, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases*, 83 Colum.L.Rev. 1745 (1983) (The various approaches that have been taken by the courts to child hearsay statements in sex abuse cases are unsatisfactory. Given the unusual circumstances attendant to child sex abuse and the special characteristics of its young victims, the rationale of the hearsay rule and its exceptions requires that an alternative approach be employed to assess the admissibility of child hearsay statements.).

Ms. DeCouto's testimony was at most cumulative. If its admission constituted error, the error was harmless. *See United States v. Morris*, 700 F.2d 427, 431 (1st Cir.), *cert. denied sub nom., Graham v. United States*, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983). ED herself took the stand and gave, in general, the same description of Ellis' assaults and threats as her mother testified she had given earlier. ED was cross-examined as to this by Ellis' counsel. The jury had before it, moreover, the letter Ellis wrote to Robert Andrews, in which Ellis admitted to having engaged in sexual activities with the girl. Even assuming, therefore, it was error to allow Ms. DeCouto's testimony, its effect was essentially repetitive and—because ED was available at trial for cross-examination—did not violate Ellis' confrontation clause

rights. *See Kotteakos v. United States*, 328 U.S. 750, 760–65, 66 S.Ct. 1239, 1245–48, 90 L.Ed. 1557 (1946). We would not order a new trial whatever the admissability of Ms. DeCouto's testimony. *Morris*, 700 F.2d at 431; *United States v. Ferreboeuf*, 632 F.2d 832, 834 (9th Cir.1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 368 (1981). We, therefore, reject Ellis' claim of reversible error in respect to this evidence.

## IV. *SOCIAL WORKER'S TESTIMONY*

The government also introduced the testimony of Marilyn Reedy, an experienced, but unlicensed, investigative social worker with the Massachusetts Department of Social Services who had interviewed both ED and LM during the initial investigation. The court did not allow Ms. Reedy to repeat any remarks ED made to her. However, it allowed Ms. Reedy to recount her observations of the interactions and gestures of LM (ED's younger half-sister who was then two-and-a-half years old) when playing with anatomically correct dolls.[6] Specifically, Ms. Reedy noted that LM "took the hand of the adult male doll and put it in the vaginal opening of the female doll." Ellis contends this testimony was inadmissible hearsay of a most prejudicial nature.

In a pretrial Memorandum and Order dated May 9, 1990, the district judge ruled that Ms. Reedy's testimony about LM playing with anatomical dolls would be admissible under Fed.R.Evid. 803(24). The court found that LM was too young to testify. Then, pursuant to Fed.R.Evid. 404(b), the court determined that Ms. Reedy could testify as to the "statements" (i.e. remarks and gestures with the dolls) made to her by LM. The judge reasoned in his memoran-

---

**5.** Even though the Government's brief does not cite specifically to Rule 803(4), we gather that the Government's second proposed theory is meant to fall under the "treatment/diagnosis" exception of Fed.R.Evid. 803(4).

**6.** Ms. Reedy provided LM with four anatomically correct dolls—an adult male, an adult female, a child female and a child male. LM undressed all except the latter, naming the adult male

"Daddy" and giving the female child doll her own name. The social worker testified,

> She [LM] began to play with the dolls. They were in close proximity. And I asked her— the [LM] doll and the daddy doll were in her hand and in close proximity. I said does daddy hug [LM]; she said yes. And he touches me. She took the hand of the adult male doll and put it on the vaginal opening of the female doll.

dum that the testimony of the social worker fit the five criteria noted in *United States v. Renville*, 779 F.2d 430, 439 (8th Cir.1985), for admission of otherwise hearsay statements under the residual exception in Fed.R.Evid. 803(24).[7]

Our review of the district court's decision to admit testimony under Fed.R.Evid. 803(24) is governed by an abuse of discretion standard. *United States v. Benavente Gomez*, 921 F.2d 378, 384 (1st Cir.1990). Congress, however, intended the residual hearsay exception to "be used very rarely, and only in exceptional circumstances." S.Rep. No. 1277, 93d Cong., 2d Sess. 20, *reprinted in* 1974 U.S.Code Cong. & Ad. News 7051, 7065–66. Moreover, the Supreme Court's recent pronouncements in *Idaho v. Wright*, —— U.S. ——, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), indicate that to avoid conflict with the confrontation clause, evidence admitted under the residual clause must possess a high degree of independent trustworthiness. Prior to *Idaho*, the residual exception to the hearsay rule has been used by other courts to allow the testimony of social workers regarding statements made to them by children about sexual activity with a defendant. *See United States v. Shaw*, 824 F.2d 601, 610 (8th Cir.1987), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988); *United States v. Dorian*, 803 F.2d 1439 (8th Cir.1986). In *Idaho*, decided shortly after the present case was tried, the Supreme Court articulated the analytical framework for the admission of children's statements under the residual exception. Declining to "endorse a mechanical test for

determining 'particularized guarantees of trustworthiness' under the [Confrontation] Clause," the Court held that the "unifying principle is that the ... factors [to be used by the trial court in making the evidentiary determination] relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Idaho* 110 S.Ct. at 3150. Findings of "particularized guarantees of trustworthiness" should be based on the totality of the surrounding circumstances—these latter being "only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* at 3148.

While the question is close, we believe that the criteria set out in *Idaho* were met here. In comparison with the situation in *Idaho*, stronger indicia of trustworthiness existed to justify admission of the witness' report of LM's play with the anatomical dolls. Other than asking about whether "daddy" hugged her, the social worker asked virtually no questions. She testified that she was trained not to do so, and that LM's gesture with the male "daddy" doll's hand towards the "LM" doll's vagina area was spontaneous.[8] On cross-examination, Ms. Reedy confirmed that she "never asked her [LM] while she was handling the dolls to do anything with them but simply waited until she did something[.]" Also indicative of truthfulness was LM's subsequent negative answer to the social worker's later question, "did daddy ever ask you to touch his she–she" (LM's name for penis). We conclude that the district court's decision to

---

**7.** The district court noted that, under *Renville*, 779 F.2d at 439, admissibility under Rule 803(24) requires satisfaction of five criteria:

(1) The statement must have circumstantial guarantees of trustworthiness equivalent to the twenty three specified exceptions listed in rule 803;

(2) The statement must be offered as evidence of a material fact;

(3) The statement must be more probative on the point for which it is being offered than any other evidence the proponent can procure through reasonable efforts;

(4) The general purposes of the Federal Rules and the interests of justice must be served by admission of the evidence into evidence;

(5) The proponent of the evidence must give the adverse party the notice specified within the rule.

**8.** The child was never asked to reenact a situation, but was simply given the dolls to play with. *See State v. Deanes*, 323 N.C. 508, 374 S.E.2d 249, 256 (1988) (child's enactment of sexual intercourse through the use of anatomically correct dolls found strongly corroborative of trustworthiness), *cert. denied*, 490 U.S. 1101, 109 S.Ct. 2455, 104 L.Ed.2d 1009 (1989). It might have been desirable had LM's play in front of the social worker been videotaped, but we do not think this was essential to a finding of trustworthiness. *See Idaho*, 110 S.Ct. at 3145, 3148.

allow the evidence under Rule 803(24) was not an abuse of discretion.

Ms. Reedy's testimony was corroborated by ED's own testimony that once, at the Berkshire home, she saw Ellis place his fingers in her baby sister's vagina. The Supreme Court in *Idaho* made clear that corroboration does *not* make a statement trustworthy, 110 S.Ct. at 3150, although it could, in an appropriate case, render any error in admitting the statement harmless. Given that LM was not the alleged victim and that Ms. Reedy's testimony was merely corroborative of Ellis' conduct towards LM, the Reedy testimony might, in any event, be harmless. *Morris*, 700 F.2d at 431. Because we hold, however that the reported play conduct was admissible under Rule 803(24), we do not reach the question of harmlessness.

## V. *UPWARD DEPARTURE*

■ Ellis' final contention is that his twenty-five year sentence was excessive under the Sentencing Guidelines. The government had requested the judge to impose a 30–year term of imprisonment, the statutory maximum under 18 U.S.C. § 2423. This, the court found, would be "too extreme." Instead, the court departed upward 65 months from the 235 month upper end in the Guidelines, and imposed three successive sentences of 100 months, for a total of 25 years.[9] The court based its upward departure on § 5K2.3 of the Guidelines, which permits an upward departure for "Extreme Psychological Injury,"[10] and on § 5K2.8, which permits an upward departure for "Extreme Conduct" on the part of the defendant.[11] The court stated:

> [t]he devastating effect the jury's decision has reached and which I have found credible as shown by the mother and the daughter who testified in this court makes me feel that ... [Guidelines] § 5K2.3 and 5K.2.8 [sic], which deal with extreme psychological injury to the victim, and extreme conduct on the part of the defendant, makes me feel it's entirely appropriate to depart upward....

9. As reported in the presentence report, Ellis' offense level was computed in the following way: for each count the base offense level was determined to be 16 under Guidelines § 2G1.2. Under § 2G1.2(b)(1), 4 levels were added because the offense involved the use of coercion. Under 2G1.2(b)(2), 4 levels were added because the conduct involved the transportation of a minor under the age of twelve. Under § 3B1.3, 2 additional levels were added because the defendant abused a position of public or private trust (common law stepfather) in a manner that facilitated the commission or concealment of the offense. Under § 3C1.1, 2 levels were added for obstruction of justice during the investigation or prosecution of the offense. The result was that for each count the adjusted offense level was 28. A multiple count adjustment raised the total offense level to 31. Ellis' Criminal History was determined to be VI. In these circumstances the applicable imprisonment range under the Guidelines is from 188 to 235 months. (The statutory maximum under 18 U.S.C. § 2423 is 10 years—120 months—on each count.) Under the statute, Ellis could have been sentenced to a maximum of 30 years (360 months). He received three consecutive sentences of 100 months each, for a total of 300 months (25 years). The district court sentenced Ellis to 65 months more than the upper end of the Guideline range.

10. The policy statement for Guidelines § 5K2.3 reads:

> If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the severity of the psychological injury and the extent to which the injury was intended or knowingly risked.
> Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns. The court should consider the extent to which such harm was likely, given the nature of the defendant's conduct.

11. The policy statement for § 5K2.8 reads:

> If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain, and humiliation.

What I observed from the little girl and her testimony here makes me feel that psychologically she could well be scarred for the rest of her life. I don't know how long this is going to go on. But it's obvious her relationship with men in the future [may] well be marred if she grows to womanhood, and the life she has to look forward to is not one I would recommend for my worse enemy. And that's the situation as I see it. I find that that was according to the statute an unusually heinous, cruel, brutal, and degrading, and the action resulted in psychological injury much more serious than that normally resulting from commission of the offense itself.

Ellis insists that the provisions of the Sentencing Guidelines covering violations of 18 U.S.C. § 2423 already show an awareness of the same aggravating circumstances that the court cited to justify its departure upwards. Accordingly, Ellis says, the upward departure contravened § 5K2.0 of the Guidelines, which permits departure only if the sentencing court finds "that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." Manifestly, Ellis says, since there is an increase of 4 levels in the base offense level if the victim is under the age of twelve, the Guidelines take into consideration the inherent psychological injury re-sulting to a young victim of criminal sexual abuse.

We examine Ellis' contentions in light of the approach we have articulated in *United States v. Diaz Villafañe*, 874 F.2d 43, 49 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989). *See United States v. Scott*, 915 F.2d 774, 777 (1st Cir.1990). In so doing, we give "due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e).

We hold, first, that the factors mentioned by the district court warrant departure as a matter of law. The district court's decision to depart was not based simply on the victim's age, an element already incorporated in the base offense, but on the extreme psychological harm inflicted on the victim as a result of Ellis' extreme conduct. Not only did Ellis continuously assault ED, his abuse took particularly degrading and insulting forms. The Guidelines provide for upward departure in such circumstances. § 5K2.3, note 10, *supra*. The victim's counselor testified that ED had suffered extreme stress, fear of physical harm to herself and her family, and guilt over these traumatic experiences.[12] We believe this is

---

12. The presentence report, dated June 27, 1990, states that as a result of the offense, ED was involved in individual counseling sessions since July 20, 1989. At the time, the sessions lasted for approximately thirty minutes and cost the defendant's mother $60 per session. At the time of sentencing, Ms. DeCouto had paid approximately $1,800 for ED's individual counseling. The following is a status report from the victim's counselor:

ED was referred for individual counseling sessions by her mother after contacting a resource center for sexual assault victims. During our subsequent interviews, ED was able to describe and demonstrate with the use of anatomically-correct dolls the incidents of sexual abuse that occurred for approximately three years by Ellis, the mother's boyfriend at the time.

Based on my clinical experience in regards to several hundred child sexual abuse victims over the past six years, ED has suffered extreme stress, fear of physical harm to herself and her family, and guilt over these traumatic experiences.

Since the disclosure, ED has exhibited severe stress reactions, fear and internalized anger, as well as intense hostility directed toward the perpetrator. My treatment with ED has included first crisis intervention work immediately following disclosure, short-term therapy (six months, one year) and will include long-term treatment, lasting up to two years or more.

ED has exhibited intense guilt feelings around feelings of responsibility for the sexual behavior and responsibility following disclosure. She has exhibited fear, depression, and low self-esteem as a result of the long-term abusive incidents.

However, my client has made progress since the trial has ended in her body image, losing weight (15 pounds) most recently. Previously during the years of her abuse, ED would compulsively overeat to avoid being repeatedly victimized by Ellis.

the sort of psychological injury the framers of § 5K2.3 contemplated. At least one other court has applied § 5K2.3 to enhance a sentence where a child under the age of twelve suffered extreme and unusual psychological injury from sexual abuse. *See United States v. Fire Thunder*, 908 F.2d 272, 274 (8th Cir.1990). Because Ellis' behavior was excessive and outrageous, departure was also justified, as a matter of law, under § 5K2.8.

The second prong under *Díaz Villafañe* was also met. The factors the judge used to depart were adequately founded in the evidence.

The third and final prong under *Díaz Villafañe* calls for determining whether 65 months is a reasonable departure from the upper end of the applicable Guideline. We cannot say this increase was unreasonable. The district court had ample reason to conclude that Ellis' behavior was an extremely vicious instance of the charged offense, and that it inflicted extreme psychological harm upon ED. The district court justifiably found that Ellis' behavior was exceptionally heinous, cruel, brutal, humiliating and degrading to the victim, and that it resulted in psychological injury much more serious even than that normally resulting from commission of the offense itself. We conclude that the district court did not exceed its discretion in the sentence it imposed.

*Affirmed.*

The long-term effects ED could likely experience may involve psychological trauma of cognitive impairment, avoidance and distancing behavior from adults in her life as a means of protection, and hypervigilence. Also, she may identify with the aggressor as a major defense mechanism, depressive affect and self-destructive behavior.

With continued counseling, I anticipate that ED will be less vulnerable to subsequent psychological impairment, educational and social failure, and will be able to achieve mastery and control over events that she felt helpless and powerless over.

I am hopeful that ED will continue to see herself as a survivor of these traumatic events and not cling to an identification as a victim.

I will continue to meet with ED and her family to deal with the impact of the long-standing molestation, to resolve the issues of blame and responsibility and to reassure her of her safety and protection, which she had been extremely anxious, to the point of panic.