USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-1301 UNITED STATES, Appellee, v. ALFRED TRENKLER, Defendant - Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Morris M. Goldings with whom Amy J. Axelrod, R. David Beck, and ___________________ ______________ ______________ Mahoney, Hawkes & Goldings were on brief for appellant. __________________________ Paul V. Kelly, Assistant United States Attorney, with whom Frank ______________ _____ A. Libby, Jr., Assistant United States Attorney and Donald K. Stern, _____________ ________________ United States Attorney, were on brief for appellee. ____________________ July 18, 1995 ____________________ STAHL, Circuit Judge. Following a lengthy criminal STAHL, Circuit Judge. _____________ trial, a jury convicted defendant Alfred Trenkler of various charges stemming from a bomb explosion in Roslindale, Massachusetts ("the Roslindale bomb"). On appeal, Trenkler challenges the admission of evidence relating to his participation in a prior bombing that occurred five years earlier in Quincy, Massachusetts ("the Quincy bomb"). Trenkler also assigns error to two evidentiary rulings admitting evidence derived from a computer database that purported to establish that Trenkler built both the Quincy and the Roslindale bombs and several out-of-court statements made by a fellow participant in the bombing. After careful review, we affirm. I. I. __ Background Background __________ On October 28, 1991, a bomb exploded at the Roslindale home of Thomas L. Shay ("Shay Sr."), killing one Boston police officer and severely injuring another. The two officers, members of the Boston Police Department Bomb Squad, had been dispatched to Shay Sr.'s home to investigate a suspicious object located in Shay Sr.'s driveway. Shay Sr. had earlier reported that, while backing his 1986 Buick Century into the street the day before, he had heard a loud noise emanating from beneath the floorboard of his -2- 2 automobile. Shay Sr. added that, subsequently, he found the suspicious object resting near the crest of his driveway. Following the explosion, a massive investigation ensued involving a variety of federal, state and local law- enforcement agencies. On June 24, 1993, this investigation culminated with the return of a three-count indictment charging Trenkler and Thomas A. Shay ("Shay Jr."), Shay Sr.'s son, with responsibility for the Roslindale bombing.1 Trenkler filed a successful severance motion, and the government tried the two defendants separately. Shay Jr. was tried first, and a jury convicted him on counts of conspiracy and malicious destruction of property by means of explosives.2 At Trenkler's trial, the thrust of the government's case was that Trenkler had built the Roslindale bomb for Shay Jr. to use against his father. To establish Trenkler's identity as the builder of the bomb, the government offered, inter alia, evidence that Trenkler had previously constructed _____ ____  ____________________ 1. The June 24, 1993, indictment specifically charged Trenkler and Shay Jr. with conspiracy, 18 U.S.C. 371; receipt of explosive materials with knowledge and intent that they would be used to kill, injure and intimidate, and cause damage to real and personal property, 18 U.S.C. 844(d); and malicious destruction of property by means of explosives; 18 U.S.C. 844(i). The indictment superseded a five-count indictment initially returned against Trenkler and Shay Jr. on December 16, 1992. 2. The district court sentenced Shay Jr. to concurrent sentences of 188 and 60 months.  -3- 3 a remote-control device, the Quincy bomb, which exploded in Quincy, Massachusetts, in 1986. The government contended that unique similarities in design, choice of components, and overall modus operandi between the two bombs compelled the _____ ________ conclusion that Trenkler had designed and built both devices. Prior to trial, the government filed a motion in limine __ ______ seeking to admit the "similarity" evidence. Following a day- long evidentiary hearing, the district court ruled the evidence admissible, finding that it was relevant on the issues of identity, skill, knowledge, and intent. Although Trenkler did not testify at trial, his counsel stipulated at the evidentiary hearing that Trenkler had built the Quincy bomb.3  1986 Quincy Bomb 1986 Quincy Bomb ________________ Trenkler constructed the Quincy bomb in 1986 for a friend, Donna Shea. At the time, Shea was involved in a dispute with the owners of the Capeway Fish Market and she wanted the bomb to use as a means to intimidate them. At her request, Trenkler assembled a remote-control, radio-activated explosive device. The device was later attached to the undercarriage of a truck belonging to the Capeway Fish Market  ____________________ 3. During the original 1986 investigation of the Quincy bombing, Trenkler admitted building the bomb. In 1987, the Commonwealth of Massachusetts brought charges against Trenkler for his involvement in the Quincy bombing, but the charges were dismissed. -4- 4 and detonated in the middle of the night. The resulting bomb blast caused no injuries and little property damage. In building the Quincy bomb, Trenkler used as the explosive material a military flash simulator typically utilized to mimic gunfire in combat exercises. To provide remote-control capabilities, Trenkler employed a radio- receiver he had removed from a small toy car. Trenkler wrapped the bomb in duct tape and attached a large donut- shaped speaker magnet to enable the bomb to adhere to the undercarriage of the truck. Other components Trenkler used included a "double throw" toggle switch, four AA batteries, two six-volt batteries, an electric relay, solder, various wires, and a slide switch. Testimony at trial established that Trenkler purchased some of the electrical components for the Quincy bomb from a Radio Shack store. On one occasion, Trenkler sought to obtain needed components by sending Shea's eleven- year-old nephew into a Radio Shack store with a list of items to purchase while Trenkler remained waiting outside. Shea's nephew, however, was unable to find all of the items, and Trenkler eventually came into the store to assist him.  1991 Roslindale Bomb 1991 Roslindale Bomb ____________________ The government contended that Trenkler built the Roslindale bomb at Shay Jr.'s request. At trial, the government offered evidence about Trenkler's relationship -5- 5 with Shay Jr., dating back at least two years prior to the Roslindale bombing. Several witnesses, including Trenkler's business partner, reported seeing the two together on different occasions in 1990 and 1991. Shay Jr.'s address book included an entry for Trenkler listing his current pager number. Moreover, Trenkler's roommate at the time of the Roslindale bombing testified that, during September and October of 1991, Shay Jr. left several voice-mail messages on the pager for Trenkler.  Testimony from government investigators and Shay Sr. established that the Roslindale bomb was a remote- control, radio-activated device with an explosive force supplied by two or three sticks of dynamite connected to two electrical blasting caps. A black wooden box weighing two or three pounds and measuring approximately eight- to ten-inches long, five- to six-inches wide and one- to two-inches deep housed the bomb. A large donut-shaped magnet and several smaller round magnets attached to the box were used to secure the device to the underside of Shay Sr.'s automobile. Other components used in the construction of the bomb included duct tape, a "single throw" toggle switch, four AA batteries, five nine-volt batteries, a Futaba radio receiver, solder, various wires, and a slide switch.  According to the government's experts and Shay Sr., the bomb was originally attached to the undercarriage of Shay -6- 6 Sr.'s automobile directly beneath the driver's seat. The government's explosives expert testified that if the bomb had exploded while still attached to the car, it probably would have killed or at least seriously injured any individual sitting in the driver's seat. The government also asserted that Trenkler used Shay Jr. to purchase the electronic components used in the bomb. In support of this assertion, the government introduced a sales receipt for a toggle switch purchased in October 1991 at a Radio Shack store located across the street from where Trenkler, at the time, was installing a satellite dish.4 Agents from the Bureau of Alcohol, Tobacco and Firearms ("ATF") recovered from the debris of the Roslindale bomb a switch identical to the one purchased. Shay Jr. admitted purchasing the switch during a taped television interview, portions of which the government introduced at trial.5 Furthermore, a sales clerk at the Radio Shack testified that, prior to purchasing the switch, the person  ____________________ 4. Trenkler has an extensive background in electronics. At the time of the Roslindale bomb, he operated his own business installing satellite dishes and other electronic equipment. 5. The Radio Shack sales receipt has the letters "sahy jyt" printed in a space for the customer's address and lists the customer's "ID" number (the last four digits of the customer's phone number) as "3780." The government maintains that this corroborates Shay Jr.'s statement that he purchased components for the bomb because "sahy" is a transposition of "Shay" and "3780" is a transposition of "7380," the last four digits of Shay Sr.'s phone number.  -7- 7 who bought it had browsed in the store for several minutes, appearing to shop for items written on a list. The sales clerk also testified that he recalled seeing Trenkler in the store on two or three occasions during the fall of 1991. Both the government and Trenkler elicited testimony from their respective explosives experts explaining the similarities and differences between the two bombs. Both experts testified at length concerning the electronic designs, the choice of components and the method of construction. The government's expert opined that the two incidents shared many similar traits and characteristics, evincing the "signature" of a single bomb maker. He further stated that he had no doubt "whatsoever" that the same person built both bombs. Trenkler's expert, on the other hand, stated that too many dissimilarities existed to conclude that the same person built both bombs. Moreover, Trenkler's expert testified that the similarities that existed lacked sufficient distinguishing qualities to identify the two bombs as the handiwork of a specific individual. EXIS Computer Database Evidence EXIS Computer Database Evidence _______________________________ To support the inference that Trenkler built both bombs, the government offered testimony both at the pretrial hearing and at trial concerning information retrieved from an ATF computer database of explosives and arson incidents. Stephen Scheid, an Intelligence Research Specialist with ATF, -8- 8 testified that the database, known as EXIS, contains information taken from reports submitted to ATF by various federal, state and local law-enforcement agencies. Scheid further testified that he had been personally responsible for maintaining the database since 1977. Scheid stated that he reviews submitted incident reports, culling from them information describing the characteristics of each bombing or arson episode. Scheid added that he then encodes the extracted information on a standardized worksheet, which he or a data-entry person in turn uses to enter the information into the database. Scheid testified that, through the use of a computer program, he then produces investigatory leads by retrieving all incidents entered in the database that are listed as possessing a specific component or characteristic. Scheid further testified that, in an effort to identify the builder of the Roslindale bomb, he performed a series of computer queries, focusing on characteristics of the Roslindale bomb. This series of inquiries narrowed the field of reported incidents in the database from 40,867 to seven.6  ____________________ 6. The computer queries and the total number of resulting incidents are listed below. The queries are successive. All incidents in database - 40,867 Bombings and attempted bombings - 14,252 Involving cars and trucks - 2,504 -9- 9 The seven remaining incidents included both the Roslindale and Quincy bombs. Scheid stated that he subsequently conducted a manual analysis of the remaining incidents and was able to identify several additional characteristics common to only the Roslindale and Quincy bombs.7 Scheid also testified that the report of the Quincy bomb did not come to his attention through normal procedures. Scheid did not receive information about the 1986 Quincy bomb, nor enter any information pertaining to it into the EXIS database, until after the Roslindale incident in 1991.8 Other Trial Evidence  Other Trial Evidence ____________________ The government also offered the testimony of David Lindholm to establish that Trenkler had built the Roslindale bomb. Lindholm testified that he met Trenkler at the  ____________________ Under vehicles - 428 Remote-control - 19 Using magnets - 7 7. Scheid testified that, of the seven remaining incidents, only the Roslindale and the Quincy bomb were reported as possessing all of the additional features: duct tape, soldering, AA batteries, toggle switches, and "round" magnets. 8. Scheid testified that, in entering information about the Quincy bombing into the EXIS database, he relied solely on a laboratory report prepared in 1986 by investigators from the Massachusetts Department of Public Safety. This report, however, does not state that the Quincy bomb was attached to the underside of the Capeway truck. It only refers to the bomb as an "[e]xplosion on truck." Nevertheless, Scheid used "under vehicle" as one of the computer queries that matched the Quincy and Roslindale bombings. -10- 10 Plymouth House of Correction where they had spent four days incarcerated together in an uncomfortable orientation holding cell in December 1992. Lindholm testified that initially the cell had held about forty-four prisoners, but that eventually the total number of prisoners in the cell dwindled to six or seven. Lindholm added that he had numerous conversations with Trenkler over the course of the four days as they gradually "bonded" upon discovering that they came from the same home town and had similar backgrounds.  Lindholm testified that he gave Trenkler legal advice based on his own experience as a criminal defendant. Lindholm acknowledged that Trenkler initially asserted his innocence and had maintained that he could not understand why Shay Jr. had implicated him in the case. Lindholm testified further that Trenkler later told him that the government knew that some of the components used in the Roslindale bomb had been purchased locally and that, in response, Lindholm opined that the bomber had been careless not to have gone out of state. To this, Trenkler agreed and then stated that the local purchase was "regrettable." In addition, Lindholm recalled that at one point during the four days they discussed Trenkler's involvement with the 1986 Quincy bomb. Lindholm testified that, during this discussion, Trenkler asserted that the Roslindale bomb was much more powerful than the bomb he had built in 1986. -11- 11 Ultimately, Lindholm stated that Trenkler admitted building the Roslindale bomb, testifying that: [Lindholm:] At one point he stated, ["W]ell, even if I did build a bomb, I did not place it on the car.["] [Government:] What happened next? [Lindholm:] Then he paused for a moment and said, ["S]o, I built the bomb. I built the bomb. I don't deserve to die or spend the rest of my life in prison for building this device.["] Lindholm added further that Trenkler "stated that the two bomb squad officers were foolish and negligent for not wearing body armor at the time that they were examining this device, and in essence that it served them right for what happened to them. It wasn't his fault."  At the time of trial, Lindholm was serving sentences stemming from convictions on federal drug and tax evasion charges. Lindholm testified that he had not received nor discussed receiving anything from the government in return for his testimony. On cross examination, Trenkler's counsel made only a minimal effort to impeach Lindholm, raising matters unrelated to his testimony implicating Trenkler. Primarily Trenkler's counsel attempted to challenge Lindholm's assertion that, as a small boy, he had at one time lived on the same street as Trenkler and to show that Lindholm was at the Plymouth House of Correction in December 1992 in order to provide information to the -12- 12 government on other individuals with whom he had been involved in past criminal activities. In addition to Lindholm's testimony, ATF Agents Dennis Leahy and Thomas D'Ambrosio recounted a November 6, 1991, interview they conducted with Trenkler shortly after the bombing. During this interview, Trenkler admitted building the Quincy bomb and sketched a circuit diagram describing it. After making the sketch, Agent D'Ambrosio asked Trenkler how the diagram would differ if Trenkler had used dynamite like that utilized in the Roslindale incident. Both agents testified that, in response to this question, Trenkler drew a second diagram, which featured two sticks of dynamite connected to two electrical blasting caps. Both agents added that they were surprised when they saw the diagram because the use of two electrical blasting caps was a distinctive feature of the Roslindale bomb that, at the time of the interview, had not been disclosed to the public.9 At trial, Leahy also related other conversations he had with Trenkler in which Trenkler conveyed a working knowledge of dynamite and electrical blasting caps. Leahy further testified about a statement Trenkler made to him at the ATF offices on February 4, 1992. Leahy  ____________________ 9. Although the agents conducted the interview during a search of Trenkler's place of business (to which Trenkler had consented), neither agent attempted to keep the drawing and, consequently, it was not produced at trial.  -13- 13 explained that Trenkler had come to the offices on his own accord to pick up previously-seized business records. Leahy stated that, during his visit, Trenkler engaged Leahy in a long discussion, lasting more than two hours, about the course of the investigation. According to Leahy's testimony, after Leahy had ended the discussion, Trenkler announced arrogantly upon leaving the ATF offices that "If we did it, then only we know about it. How will you ever find out . . . if neither one of us talk[]?"  The jury returned a guilty verdict on all counts of the indictment. Subsequently, the district court sentenced Trenkler to concurrent terms of life imprisonment on the counts of receipt of explosive materials and attempted malicious destruction of property by means of explosives and sixty months on the count of conspiracy. Trenkler now appeals.  II. II. ___ Discussion Discussion __________ On appeal, Trenkler assigns error to the admission of the Quincy bomb evidence, contending primarily that the incident was not sufficiently similar to the Roslindale bomb to be relevant on the issue of identity, and to the admission of the EXIS database-derived evidence that the government used to prove the similarity of the two bombs. Trenkler additionally argues that the district court erroneously -14- 14 admitted several out-of-court statements made by Shay Jr. We discuss each argument in turn.10 A. Quincy Bombing Evidence ___________________________ We begin with Trenkler's contention that the district court erred in admitting the evidence of the Quincy bombing. 1. Fed. R. Evid. 404(b): Other Act Evidence _____________________________________________ In general, Rule 404(b)11 proscribes the use of other bad-act evidence solely to establish that the defendant has a propensity towards criminal behavior. Rule 404(b)'s proscription, however, is not absolute: the rule permits the  ____________________ 10. Trenkler also raises the issue of prosecutorial misconduct. Trenkler contends that counsel for the government intentionally made inflammatory remarks in the government's opening statement and introduced prohibited other-act evidence in contravention of representations previously made to the district court. We find no merit in these contentions.  11. Fed. R. Evid. 404(b) provides: (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial. -15- 15 use of such evidence if it bears on a material issue such as motive, knowledge or identity. In this Circuit, we have adopted a two-part test for determining the admissibility of Rule 404(b) evidence. E.g., United States v. Williams, 985 ____ _____________ ________ F.2d 634, 637 (1st Cir. 1993). First, the district court must determine whether the evidence has some "special relevance" independent of its tendency simply to show criminal propensity. E.g., United States v. Guyon, 27 F.3d ____ ______________ _____ 723, 728 (1st Cir. 1994). Second, if the evidence has "special relevance" on a material issue, the court must then carefully conduct a Rule 40312 analysis to determine if the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. Williams, 985 ________ F.2d at 637. As with most evidentiary rulings, the district court has considerable leeway in determining whether to admit or exclude Rule 404(b) evidence. Accordingly, we review its decision only under the lens of abuse of discretion. Id.; ___ see also United States v. Fields, 871 F.2d 188, 196 (1st ___ ____ ______________ ______ Cir.), cert. denied, 493 U.S. 955 (1989).  _____ ______  ____________________ 12. Fed. R. Evid. 403 provides: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. -16- 16 2. Identity ____________ The government offered the evidence of the Quincy bomb, which Trenkler admitted building, primarily to prove that Trenkler also built the Roslindale bomb. The government contends that the evidence of the Quincy bomb has "special relevance" on the issue of identity because the numerous similarities surrounding the Quincy and Roslindale incidents compel the conclusion that the same individual built both bombs. Trenkler, on the other hand, argues that the Quincy incident is too dissimilar to be relevant on the issue of identity, and even if it has some relevance, the risk of unfair prejudice that it poses far outweighs its probative value. We agree with the government that the Quincy bomb evidence has "special relevance" on the issue of identity and that the district court did not abuse its considerable discretion in admitting it. a. Rule 404(b) Evidence: Special Relevance ____________________________________________ When, as in this case, Rule 404(b) evidence is offered because it has "special relevance" on the issue of identity, we have required, as a prerequisite to admission, a showing that there exists a high degree of similarity between the other act and the charged crime. See United States v. ___ ______________ Ingraham, 832 F.2d 229, 231-33 (1987), cert. denied, 486 U.S. ________ _____ ______ 1009 (1988). Indeed, the proponent must demonstrate that the two acts exhibit a commonality of distinguishing features -17- 17 sufficient to earmark them as the handiwork of the same individual. Id. at 231. This preliminary showing is ___ necessary because  [a] defendant cannot be identified as the perpetrator of the charged act simply because he has at other times committed the same commonplace variety of criminal act except by reference to the forbidden inference of propensity. The question for the court[, therefore, must be] whether the characteristics relied upon are sufficiently idiosyncratic to permit ____________ _____________ an inference of pattern for purposes of proof.  United States v. Pisari, 636 F.2d 855, 858-59 (1st Cir. 1981) _____________ ______ (internal quotations and citations omitted) (emphasis added). Resolving whether the prior act is sufficiently similar to the charged offense to have "special relevance" on the issue of identity, however, is essentially an issue of "preliminary" or "conditional" fact. In other words, the prior act has no tendency to prove the perpetrator's identity -- i.e., it is not relevant -- unless the proponent can first ____ establish the conditional fact: that the two acts are sufficiently idiosyncratic to support the inference that they are the handiwork of the same individual. The admissibility of evidence whose relevance turns on the resolution of a conditional fact is governed by Fed. R. Evid. 104(b). See ___ Huddleston v. United States, 485 U.S. 681, 689 (1988). Rule __________ _____________ 104(b) provides, "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit -18- 18 it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Fed. R. Evid. 104(b). Moreover, [i]n determining whether the Government has introduced sufficient evidence to meet Rule 104(b), the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence. Huddleston, 485 U.S. at 690. Thus, as here, when a party __________ seeks to admit Rule 404(b) evidence to establish identity, the district court must condition its admission on a showing that the shared characteristics of the other act and the charged offense are sufficiently idiosyncratic that a reasonable jury could find it more likely than not that the same person performed them both.13   ____________________ 13. Huddleston involved the use of Rule 404(b) evidence to __________ prove knowledge in a case where the petitioner, charged with the knowing possession of stolen video tapes, claimed that he did not know the tapes were stolen. 485 U.S. at 683. In order to prove knowledge, the government introduced evidence of the petitioner's previous involvement in sales of allegedly stolen television sets. The Supreme Court rejected the petitioner's contention that, before admitting the evidence, the district court was required to make a preliminary finding that the government had proven that the television sets were in fact stolen. Id. at 687. ___ The Court stated that "Rule 404(b) . . . protects against the introduction of extrinsic act evidence when that evidence is offered solely to prove character. The text contains no intimation, however, that any preliminary showing is necessary before such evidence may be introduced for a proper purpose." Id. at 687-88. The Court continued, ___ -19- 19 Trenkler contends that the array of similarities between the two incidents amounts to no more than a collection of "prosaic commonalit[ies that] cannot give rise to an inference that the same person was involved in both acts without reference to propensity." United States v. _____________ Garcia-Rosa, 876 F.2d 209, 225 (1st Cir. 1989), cert. denied, ___________ _____ ______ 493 U.S. 1030, cert. granted and vacated on other grounds sub _____ _______ ___ _______ __ _____ _______ ___ nom., Rivera-Feliciano v. United States, 498 U.S. 954 (1990). ____ ________________ _____________ However, in resolving whether the evidence supports an inference that the two incidents are "sufficiently idiosyncratic," we have cautioned that "an exact match is not necessary." Ingraham, 832 F.2d at 232. The test must focus ________ on the "totality of the comparison," demanding not a "facsimile or exact replica" but rather the "`conjunction of  ____________________ stating, "If offered for such a proper purpose, the evidence is subject only to general strictures limiting admissibility such as Rules 402 and 403." Id. at 688. ___ The Court then stated that evidence of the prior sales was relevant for the proper purpose of proving knowledge only if the jury could find the preliminary fact that the televisions were stolen. Id. at 689. Thus, the ___ Court held that Rule 104(b) controlled the admissibility of the evidence. Id. ___ Though the issue here arises in a slightly different context, we think that Huddleston provides the __________ appropriate framework for our analysis. Here, the government offered the Quincy bomb evidence for the proper Rule 404(b) purpose of identity. The relevance of the Quincy bomb on the issue of identity turns, however, on the factual question of whether the Roslindale and the Quincy bombings are sufficiently similar to earmark them as the handiwork of the same individual. This is analogous to whether the television sets in Huddleston were stolen, and, accordingly, Rule 104(b) __________ sets the framework for admissibility.  -20- 20 several identifying characteristics or the presence of some __ highly distinctive quality.'" Id. at 232-33 (quoting Pisari, ___ ______ 636 F.2d at 859) (emphasis added); see also United States v. ___ ____ _____________ Myers, 550 F.2d 1036, 1045 (5th Cir. 1977) ("[A] number of _____ common features of lesser uniqueness, although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together."). In this case, we think the balance of the evidence tilts sufficiently towards admission to satisfy the first step of the Rule 404(b) analysis. Accordingly, we believe that the district court did not abuse its discretion in determining that the numerous similarities in components, design, and technique of assembly, combined with the similar modus operandi and the closeness of _____ ________ geographic proximity between the two events, sufficiently support the inference that the same person built both bombs. We begin by noting that the government's explosives expert, Thomas Waskom, testified that his analysis of the similarities shared by the two incidents left him with no doubt "whatsoever" that the same individual built both bombs. Our own review of the record reveals that the two bombs did indeed share a number of similar components and characteristics. Both bombs were remote-controlled, radio- activated, electronic explosive devices. Both were homemade mechanisms, comprising, in general, electronic components -21- 21 easily purchased at a hobby store. Both had similar, though not identical, firing and fusing circuits with separate battery power supplies for each. Both had switches in their fusing circuits to disconnect the radio receivers. To energize their respective radio receivers, both devices utilized similar power supplies, consisting of four AA batteries. Both employed many similar components such as batteries, duct tape, toggle switches, radio receivers, antennas, solder, electrical tape, and large round speaker magnets. Moreover, both used a distinctive method (i.e., ____ twisting, soldering, and taping) to connect some, though not all, of the wires used.14 Though we hardly find any of these factors by themselves to be "highly distinctive," the coalescence of them is fairly persuasive.15 Indeed, even  ____________________ 14. Though it is unclear from a close reading of the record just how many of the wires in each bomb employed this connection method, it is apparent that at least some did. More interestingly, we note that, before learning that both bombs had wires that were joined in this fashion, Trenkler's explosives expert stated that such a method is a "singularly unique method[] of assembly which individual bomb makers are very likely to repeat." 15. On the other hand, Trenkler argues that the differences between the two bombs are more significant. Some of the differences that Trenkler cites include:  Roslindale Bomb Quincy Bomb Two or three sticks of Military flash simulator used dynamite rewrapped in a which produced only minor magazine page and electrical damage blasting caps which killed one officer and severely injured another -22- 22 Trenkler's expert witness, Denny Kline, testified at the pretrial hearing that, in light of these similarities, "there is a possibility, a probability, that maybe there is a ___________ _____ __ _ connection between the maker of these two bombs." (Emphasis __________ added.) Moreover, we note that, in refusing to conclude "beyond a reasonable doubt"16 that the same person built both bombs, Trenkler's expert Kline eschewed reliance on any factors except the physical evidence. The appropriate test for sufficient similarity, however, is not so limited. "[I]n assessing the sufficiency of the evidence under Rule 104(b), the trial court must consider all evidence presented to the ___ jury." Huddleston, 485 U.S. at 690-91 (emphasis added).  __________ Accordingly, we believe some significance is properly attributed to the simple fact that both incidents  ____________________  Futaba remote control system Radio receiver taken from toy which used a small electrical car servo motor  "Single throw" toggle switch Relay allowed power to be sent used to send power to dynamite to explosives; "double throw" toggle switch used as safety Five nine-volt batteries Two six-volt batteries provided power to firing supplied power to firing system system Device was housed in a black Device was wrapped in silver wooden box duct tape 16. As the district court correctly noted in its ruling, the government is not required to establish "beyond a reasonable doubt" that the same person built the two bombs. See ___ Huddleston, 485 U.S. at 690. __________ -23- 23 are bombings. A bombing, in and of itself, is, arguably, a fairly distinctive method for intimidating or killing an individual. Cf. United States v. Patterson, 20 F.3d 809, 813 ___ _____________ _________ (10th Cir. 1994) (in a hijacking case, uniqueness of crime itself has significance in Rule 404(b) similarity analysis), cert. denied, 115 S. Ct. 128 (1994); Pisari, 636 F.2d at 858 _____ ______ ______ ("[M]uch more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive ___ ______ ____ ____ __ __ _______ ___ ___________ as to be like a signature." (quotations and citations __ __ __ ____ _ _________ omitted)). In addition, both incidents involved not simply bombs, but remote-control bombs that were placed underneath automotive vehicles.  In both instances, the bombs were constructed and used to benefit a friend of the builder. Trenkler built the Quincy bomb for Donna Shea to use to intimidate the owners of the Capeway Fish Market, and the evidence supported the inference that the person who constructed the Roslindale bomb built it for Shay Jr. to use against his father. Furthermore, in both instances the builder attempted to conceal his or her participation by using a third party to purchase the electronic components used in the explosive device. In 1986, Trenkler initially waited in his car while sending Donna Shea's nephew into the electronics store with a list to purchase the needed components. Similarly, the -24- 24 evidence supports the inference that the builder of the Roslindale bomb used Shay Jr. to purchase the needed components. Finally, the fact that both bombings occurred within a relatively close geographic proximity must be given some weight in the analysis.  In United States v. Pisari, 636 F.2d 855 (1st Cir. _____________ ______ 1981), we reversed the district court's decision to admit evidence of a prior robbery solely on the issue of identity, where the only similarity between it and the charged offense was that a knife was used. Similarly, in Garcia-Rosa, 876 ___________ F.2d at 224-25, we refused to sanction the admission of a prior drug transaction where the only characteristic linking it to the charged drug deal was the characteristic exchange of a sample of drugs prior to the sale. In Garcia-Rosa, we ___________ held that a single "prosaic commonality" was insufficient "to give rise to an inference that the same person was involved in both acts without reference to propensity." Id. at 225. ___ See also United States v. Benedetto, 571 F.2d 1246, 1259 (2d ___ ____ _____________ _________ Cir. 1978) (no signature where shared characteristic is merely "a similar technique for receiving the cash: the passing of folded bills by way of a handshake").  In the present case, however, the government presented more than a single "prosaic commonality." Indeed, the government propounded a laundry list of similarities in design, component selection, construction and overall modus _____ -25- 25 operandi. On the other hand, Trenkler offered a fairly ________ impressive list of differences between the two incidents. In the absence of one or more highly distinctive factors that in themselves point to idiosyncracy, we must examine the combination of all the factors. Had Trenkler been unable to point to any significant differences, we suspect he would have had little chance in establishing an abuse of discretion in allowing the evidence. Similarly, had the government found but three or four common characteristics to establish sufficient similarity, we doubt that the admission of the evidence would have been granted or sustained. Here, in the middle, with substantial evidence on either side and conflicting expert opinions, could a reasonable jury have found it more likely than not that the same person was responsible for both bombs? We think the answer is yes. See ___ Ingraham, 832 F.2d at 233 (admitting evidence)("[G]iven the ________ host of important comparables, the discrepancies -- though themselves not unimportant-- go to the weight of the challenged evidence, not to its admissibility.").17  ____________________ 17. As we explain infra in part II.A., we believe that the _____ district court erred in admitting the EXIS database evidence on the issue of idiosyncratic similarity. Our review of the record, however, convinces us that the EXIS evidence did not weigh significantly in the court's decision to admit the evidence of the Quincy bomb. Cf. United States v. Gallo, 20 ___ _____________ _____ F.3d 7, 14 (1st Cir. 1994) (abuse of discretion occurs when, inter alia, improper factor is accorded significant weight). _____ ____ -26- 26 b. Rule 404(b) Evidence: Probative Value and ______________________________________________ Unfair Prejudice ________________ Resolving that the district court did not abuse its discretion in determining that a rational jury could infer that it was more likely than not that the same person built both bombs, however, does not end the analysis. We must also review the trial court's determination that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. Several factors weigh heavily in this balancing, such as the government's need for the evidence, see Fields, 871 F.2d at 198 (quoting Fed. R. Evid. ___ ______ 404(b) advisory committee's note), the strength of evidence establishing the similarity of the two acts, see Huddleston, ___ __________ 485 U.S. at 689 n.6, the inflammatory nature of the evidence, and the degree to which it would promote an inference based solely on the defendant's criminal propensity, see United ___ ______ States v. Rubio-Estrada, 857 F.2d 845, 851-52 (Torruella, J., ______ _____________ dissenting) (explaining inherent unfair prejudice in evidence of prior bad acts). We believe the district court acted well within its broad discretion in admitting the evidence. First, the evidence was important to the government's case. The evidence that Trenkler had built the Quincy bomb corroborated David Lindholm's testimony, identifying Trenkler as the builder of the Roslindale bomb. Second, although the -27- 27 evidence of similarity could have been more compelling, it was nonetheless substantial: Indeed, the government's explosives expert testified that he had no doubt "whatsoever" that the same person designed and constructed both bombs.  On the other hand, we disagree with the district court that the evidence did not pose any risk of unfair prejudice.18 As with all "bad act" evidence, there is always some danger that the jury will use the evidence not on the narrow point for which it is offered but rather to infer that the defendant has a propensity towards criminal behavior. Nonetheless, outside the context of propensity, the evidence was not unduly inflammatory. The Quincy bomb did not kill or injure any individual and caused little property damage. Moreover, the district court minimized any risk of unfair prejudice by carefully instructing the jury not to use the evidence of the Quincy bombing to infer Trenkler's guilt simply because he was a bad person or because the fact he had a built a bomb in the past made it more likely he had built the bomb in this case. In sum, we believe that the district court did not abuse its discretion in determining that the probative value of the Quincy bomb  ____________________ 18. In ruling on the evidence, the district court stated, inter alia, "The evidence of the [Quincy] bomb is without _____ ____ question prejudicial in the sense that it will likely harm the defendant. That is not the test, however, the question is whether it is unfairly prejudicial. It is not." -28- 28 evidence was not substantially outweighed by the risk of unfair prejudice.19  B. EXIS Database Evidence __________________________ Trenkler contends that the district court erred in admitting under the residual hearsay exception, Fed. R. Evid. 803(24),20 testimony about the results of the search of the  ____________________ 19. Trenkler also contends that the district court abused its discretion in admitting the Quincy bomb evidence to prove knowledge, skill, and intent. With respect to the issues of knowledge and skill, we find little merit in Trenkler's argument. Obviously, the fact that Trenkler had in the past built a remote-control bomb has some relevance on whether he possessed the skill and knowledge necessary to build the Roslindale bomb. See United States v. Latorre, 922 F.2d 1, 8 ___ _____________ _______ (1st Cir. 1990), cert. denied, 502 U.S. 876 (1991). _____ ______ Furthermore, because the evidence was otherwise admissible to show identity, allowing the government to use it to show skill and knowledge, posed no additional risk of unfair prejudice. Trenkler's contention with respect to intent stands on firmer ground. We have some difficulty comprehending (and the government does not clearly articulate) any theory of "special relevance" tending to show intent that does not depend heavily on an inference of propensity. See United States v. Lynn, 856 F.2d 430, 436 ___ _____________ ____ (1st Cir. 1988) (error to admit evidence on intent where inference depends on propensity). Nonetheless, because the evidence was properly admitted to show identity, knowledge and skill, any error in its admission to show intent is harmless. See Benavente Gomez, 921 F.2d at 386 (harmless ___ _______________ error if it is "highly probable" the error did not contribute to the verdict). 20. Fed. R. Evid. 803 provides: The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . (24) Other Exceptions (24) Other Exceptions A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the -29- 29 EXIS database. He maintains that the district court erred because the underlying reports composing the EXIS database lack sufficient guarantees of trustworthiness to fall within the residual hearsay exception. We agree that the district court erred in admitting the evidence, but find the error harmless. The government offered the EXIS-derived testimony as tending to show that the Roslindale and Quincy bombs evinced the signature of a single bomb maker. Specifically, the government offered it as an affirmative assertion that, out of more than 14,000 bombing and attempted bombing incidents, only the Roslindale and the Quincy incidents possessed in common all of the queried characteristics. The district court admitted the EXIS-derived testimony under the  ____________________ court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant. -30- 30 residual hearsay exception, finding that it was "sufficiently reliable." In reaching this conclusion, the court noted that the EXIS database was used and relied upon "by law enforcement authorities on a regular basis." The government asserts that the district court did not err in admitting the testimony because, in general, the underlying reports were "written objective reports" summarizing careful field and laboratory investigations that the court could permissibly find to be particularly worthy of belief such that "adversarialtesting ... wouldaddlittle to[their]reliability." Initially, it is evident that whether or not particular evidence may be admitted under the residual hearsay exception is a fact-specific inquiry committed in the first instance to the sound discretion of the district court. United States v. Doe, 860 F.2d 488, 491 (1st Cir. 1988), ______________ ___ cert. denied, 490 U.S. 1049 (1989). We accord great _____ ______ deference to the district court's determination, reviewing it only for an abuse of discretion. E.g., United States v. ____ ______________ Benavente Gomez, 921 F.2d 378, 384 (1st Cir. 1990). ________________ Nevertheless, we will overturn a district court's determination if, upon careful review, we are left with a "definite and firm conviction that the court made a clear error of judgment" in its decision to admit the testimony. Id. (internal quotations and citations omitted). ___ -31- 31 Under the residual hearsay exception, the district court must determine, inter alia, whether the proffered _____ ____ evidence possesses "circumstantial guarantees of trustworthiness" equivalent to those possessed by the other listed exceptions to the hearsay rule. See Fed. R. Evid. ___ 803(24); Polansky v. CNA Ins. Co., 852 F.2d 626, 631 (1st ________ _____________ Cir. 1988); cf. 2 Kenneth S. Broun et al., McCormack on ___ ____________ Evidence 324, at 362 (John W. Strong ed., 4th ed. 1992) ________ (equivalent guarantees of trustworthiness is the most important issue). This trustworthiness inquiry is largely fact driven, and its focus will vary depending on the context in which the issue arises. See Brookover v. Mary Hitchcock ___ _________ ______________ Memorial Hosp., 893 F.2d 411, 420 (1st Cir. 1990). A court, _____________ however, may consider whether the evidence shares reliability factors (e.g., personal knowledge, lack of bias) common to the other hearsay exceptions, see 2 McCormack 324, at 362- ___ _________ 4, and whether the evidence, but for a technicality, would otherwise come within a specific exception, see United States ___ _____________ v. Nivica, 887 F.2d 1110, 1126-27 (1st Cir. 1989) (where ______ insufficient foundation laid to admit financial documents under business records exception, court had discretion to admit them under residual exception), cert. denied, 494 U.S. _____ ______ 1005 (1990). Essentially, the district court must determine whether the totality of the circumstances surrounding the statement establish its reliability sufficiently enough to -32- 32 justify foregoing the rigors of in-court testimony (e.g., live testimony under oath, cross-examination) that ordinarily guarantee trustworthiness. See Michael H. Graham, Federal ___ _______ Practice and Procedure: Evidence, 6775, at 737-40 (1992) __________________________________ (courts employ "ad hoc assessment of reliability based upon the totality of the surrounding circumstances"); cf. United ___ ______ States v. Ellis, 935 F.2d 385, 394 (1st Cir.) (citing Idaho ______ _____ _____ v. Wright, 497 U.S. 805, 819 (1990)) (guarantees of ______ trustworthiness in Confrontation Clause context must be established from the "totality of circumstances" surrounding the making of the statement), cert. denied, 502 U.S. 869 _____ ______ (1991). Because we believe that the government clearly failed to establish that the EXIS-derived evidence possessed sufficient "circumstantial guarantees of trustworthiness," we hold that the district court abused its discretion in admitting the evidence. As noted above, the district court rested its decision to admit the testimony, at least in part, on its finding that law-enforcement agencies use and rely on the database "on a regular basis." Though we take no issue with this narrow finding, it is hardly dispositive on the issue of trustworthiness. That law enforcement authorities rely on information culled from the database does not, a _ fortiori, imbue that information with sufficient guarantees ________ of trustworthiness to warrant admission under Rule 803(24). -33- 33 Indeed, law enforcement authorities often rely on information during their investigations (e.g., polygraph examinations, anonymous tips) that would not necessarily be admissible as evidence. See United States v. Scarborough, 43 F.3d 1021, ___ _____________ ___________ 1026 (6th Cir. 1994) (polygraph examinations generally inadmissible); and Fed R. Evid. 801, 802 (prohibiting hearsay ___ evidence).  More to the point, the government failed to establish that the reports underlying the database possessed any guarantees of trustworthiness similar to those found in the enumerated hearsay exceptions. See generally Fed. R. ___ _________ Evid. 803(1)-(23). Scheid, the government's expert on EXIS, stated that the database derived from reports submitted by a variety of federal, state and local law enforcement agencies. Though Scheid testified extensively on the reliability of the procedures he followed to cull information from the reports and subsequently input it into the EXIS database, the government offered virtually nothing establishing the reliability of the underlying reports.  On cross-examination, Scheid, who had been solely responsible for EXIS since 1977, admitted that no agency outside of the ATF was required by law to send reports to the EXIS database and that state and local agencies submitting reports were not required to follow any express procedures or conform to any specific standards in collecting or recording -34- 34 the reported information. Indeed, it is far from clear the extent to which information memorialized in any of the reports derives from laboratory analyses, on-the-scene observations of police officers, second-hand descriptions of the device by layperson witnesses, or some other source. Cf. ___ United States v. Scholle, 553 F.2d 1109, 1123-25 (8th Cir.) ______________ _______ (allowing printouts from Drug Enforcement Administration ("DEA") computer database where database comprised only chemical analyses performed at regional DEA laboratories), cert. denied, 434 U.S. 940 (1977).  _____ ______ Scheid further testified that the submitted reports need not be signed, and that nothing required the author of a submitted report to have personal knowledge of its contents, see Fed. R. Evid. 803 advisory committee's note ("In a ___ hearsay situation, the declarant is, of course, a witness, and neither this rule nor Rule 804 dispenses with the requirement of firsthand knowledge."); Fed. R. Evid. 803(6) (business record must be recorded by or from information supplied by an individual with personal knowledge), or for that matter to be qualified as a bomb investigator, see ___ Mathews v. Ashland Chem., Inc., 770 F.2d 1303, 1309-10 (5th _______ ____________________ Cir. 1985); 4 Jack B. Weinstein et al., Weinstein's Evidence, ____________________ 803(8)[03], at 803-283 ("Questions of the qualification of the expert can be raised as one of the circumstances indicating lack of trustworthiness."); cf. Beech Aircraft ___ ______________ -35- 35 Corp. v. Rainey, 488 U.S. 153, 167 n.11 (1988) _____ ______ ("investigator's skill or experience" is factor establishing trustworthiness of government evaluative report). Finally, Scheid admitted that he employed no procedures for verifying or updating information in the EXIS database that had been submitted by agencies other than ATF. The underlying reports, arguably, come closest to falling within the hearsay exception for public records and reports, Fed. R. Evid. 803(8). In criminal cases, however, Rule 803(8) does not authorize the prosecution's use of investigative reports that contain "matters observed by police officers and other law enforcement personnel," Fed. R. Evid. 803(8)(B), or "factual findings resulting from an investigation made pursuant to an authority granted by law," Fed. R. Evid. 803(8)(C). See United States v. Arias-Santana, ___ _____________ _____________ 964 F.2d 1262, 1264 (1st Cir. 1992) (police reports offered by prosecution generally inadmissible); but cf., e.g., United ___ ___ ____ ______ States v. Brown, 9 F.3d 907, 911-12 (11th Cir. 1993) (Rule ______ _____ 803(8) does not necessarily prohibit the use of police records prepared in a routine non-adversarial setting that do not result from subjective investigation and evaluation), cert. denied, 115 S. Ct. 152 (1994). Moreover, the exception _____ ______ provided by Rule 803(8) is further limited by the general qualification proscribing the use of public records if "the -36- 36 sources of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8).  We have noted that Congress intended the residual hearsay exception to be used "`very rarely, and only in exceptional circumstances.'" Benavente Gomez, 921 F.2d at ________________ 384 (quoting S. Rep. No. 1277, 93d Cong. 2d Sess., 20 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7066); see also Nivica, _________ __ ___ ____ ______ 887 F.2d at 1127 ("Rule 803(24) should be used stintingly"). Moreover, Congress did not intend for the exception "`to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions' or `to authorize major judicial revisions of the hearsay rule.'" Benavente Gomez, 921 F.2d at 384 (quoting S. _______________ Rep. No. 127). In this case, the government failed to establish that the reports composing the EXIS database possessed guarantees of trustworthiness equivalent to the other exceptions to the hearsay rule. Neither are we convinced that the totality of circumstances surrounding the reports adequately assure their reliability where no standardized procedures were employed in creating the reports and the sources of the reported information are unknown. Finally, we find it significant that the government points us to no case in which it has successfully (or unsuccessfully) sought to admit EXIS-derived evidence to prove the identity of a bomb maker. Accordingly, we hold that the district -37- 37 court abused its discretion in admitting the EXIS-derived evidence under the residual exception to the hearsay rule to prove the identity of the builder of the Roslindale bomb.21  ____________________ 21. Even putting aside our concerns about the reliability of the underlying reports, we remain, in general, somewhat troubled by the government's use of the evidence. The statement that out of more than 14,000 bombing and attempted bombing incidents in the EXIS database only the Roslindale and Quincy incidents share the eight specific queried characteristics (bombings and attempted bombings, attached under car or truck, remote-control, round magnets, duct tape, solder, AA batteries, toggle switches) is a fairly powerful statement, but perhaps a somewhat misleading one. First, the statement assumes as a necessary predicate that each of the more than 14,000 EXIS entries definitively states whether or not the explosive device described therein actually possessed those characteristics. We have some doubt about the validity of such an assumption. In general, bomb reconstruction strikes us as a rather resource-intensive operation. We can envision circumstances (e.g., a blast causing little or no injuries or damage, a ____ bomb maker apprehended before reconstruction investigation complete) where the investigation and the resulting report might not be nearly as thorough or complete as in the case of _____ either the Roslindale or the Quincy bombs. Indeed, during the preliminary hearing both Scheid and Thomas Waskom, the government's explosives expert, acknowledged that the absence of an item, such as magnets or batteries, from a post-blast report meant only that investigators did not recover or identify the item and not that it was not used. Second, without further statistical analysis of the database, we believe the statement that out of more than 14,000 incidents only the Quincy and Roslindale bombs share the eight queried characteristics is potentially incomplete. For example, by our count, the EXIS database entry for the Roslindale incident lists approximately twenty-two characteristics describing that incident. Nowhere in the record, however, does the government explain why it chose to focus on the specific characteristics used to query the database. It does not suggest that these characteristics are more important in a bomb-signature analysis than any of the other characteristics not chosen. Moreover, the government does not offer any analysis of the significance of the fact that the Roslindale and the Quincy incidents share the queried characteristics. In other words, though it is true that only the Quincy incident shares the eight queried -38- 38 Although we agree with Trenkler that the district court erred in admitting the EXIS-derived evidence, we nonetheless find the error harmless beyond a reasonable doubt.22 Initially we note that substantial evidence, beyond Trenkler's participation in the Quincy bombing, supported a finding that he had built the Roslindale bomb. Principally, David Lindholm convincingly testified that, in fact, Trenkler had actually admitted building the Roslindale bomb. Other admissions by Trenkler made to various law  ____________________ characteristics with the Roslindale incident, how many other incidents share some other set of eight (or more than eight) characteristics with the Roslindale incident?  Arguably, these concerns go more to the weight of the evidence than to its admissibility. However, we point them out here to underscore the caution a district court should employ in allowing evidence couched in terms of numerical probabilities. Cf. United States v. Massey, 594 ___ _____________ ______ F.2d 676, 679-81 (8th Cir. 1979) (testimony stating probability of match to be one chance in 4,500 unfairly confusing where no foundation for statement provided).  22. In general, we review an evidentiary miscue only for harmless error, dismissing it if "we determine that it is highly probable that the error did not contribute to the verdict." Benavente Gomez, 921 F.2d at 386 (internal ________________ quotations and citations omitted). In this case, however, Trenkler also contends that the erroneously admitted evidence deprived him of his confrontation rights under the Sixth Amendment, see U.S. Const. amend VI ("In all criminal ___ prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."). Assuming arguendo that the admission of the EXIS-derived evidence ________ rises to the level of constitutional error, we accordingly employ a stricter standard, asking whether we can consider the error harmless beyond a reasonable doubt. See United ___ ______ States v. Brennan, 994 F.2d 918, 927 (1st Cir. 1993); see ______ _______ ___ also United States v. Argentine, 814 F.2d 783, 788-89 (1st ____ _____________ _________ Cir. 1987) (constitutional errors may not be regarded as harmless if there is a reasonable possibility that the error influenced the jury in reaching a verdict). -39- 39 enforcement officers inferentially corroborated Lindholm's testimony, specifically Trenkler's sketch of the Roslindale bomb, drawn shortly after the explosion and conspicuously featuring two electrical blasting caps. Moreover, Trenkler's arrogant assertion to Agent Leahy that, "if we did it, then only we know about it . . . how will you ever find out . . . if neither one of us talk[]?" provided further corroboration. Additional support could be inferred from the ample evidence the government adduced establishing Trenkler's relationship withShayJr.and hisknowledgeofbothelectronics andexplosives.23 Furthermore, the government offered the EXIS- derived evidence to prove that the Roslindale and Quincy bombs were so similar that they evinced the signature of a single bomb maker, thus, establishing the relevance of the Quincy bomb evidence on the issue of identity. Our review of the record, however, convinces us that the EXIS-derived evidence was not a critical factor in the district court's decision to admit the Quincy bomb evidence for the purpose of proving identity. The EXIS-derived evidence was merely cumulative, corroborating the testimony of the government's explosives expert who, after testifying in detail about the  ____________________ 23. We note with some concern our dissenting colleague's suggestion that, notwithstanding Lindholm's testimony (elicited by the U.S. Attorney) that the government had not offered or promised Lindholm any consideration for his testimony, an implicit quid pro quo nonetheless existed for ____ ___ ___ his cooperation. See infra at 65 n.43. We find nothing in ___ _____ the record to support such an inference. -40- 40 similarities between the two bombs, stated that he had no doubt "whatsoever" that the same person built both bombs.24 Moreover, as discussed supra at 20-26, other circumstantial _____ evidence tending to show that the maker of each bomb used a similar modus operandi (e.g., both bombs built for a friend, _____ ________ ____ both bomb makers used third party to acquire needed components) independently supported the inference that the same person built both bombs. Finally, even putting aside whether the jury would have found the two incidents sufficiently similar to prove identity without the EXIS- derived evidence, the jury nonetheless would have been able to consider the fact that Trenkler had designed and built the Quincy bomb to prove Trenkler's knowledge and skill. In sum, while the admission of the EXIS-derived evidence would not have been harmless error if the only other evidence consisted of the expert's testimony of signature and the evidence establishing Trenkler's relationship with Shay Jr. and his electrical and explosive skills, the additional  ____________________ 24. Our dissenting colleague correctly notes that, in ruling on the admission of the Quincy bomb evidence, the district court stated that it was "adding" the statistical evidence to the expert's testimony. But we differ from his conclusion that it is "plain" that the district court relied on the EXIS-derived evidence to form "the critical final link between the two devices," see infra at 55. Indeed, the ___ _____ court's discussion focuses entirely on the expert testimony, with only the passing reference at the end to the EXIS system. In this context, we read the district court to be saying not that the EXIS evidence was necessary to its _________ decision, but only that it provided additional support for it. -41- 41 presence of several different strong sources of testimony relating Trenkler's admissions, convinces us that no rational jury could have entertained a reasonable doubt of Trenkler's guilt even in the absence of the EXIS-derived evidence.25 C. Shay Jr.'s Out-of-Court Statements ______________________________________ Trenkler additionally asserts that the district court erred by admitting testimony relating ten out-of-court statements purportedly uttered by Shay Jr. The statements, in general, tended to implicate Shay Jr. in the bombing and to suggest that Shay Jr. had not acted alone. The district court admitted the statements either as nonhearsay evidence of Shay Jr.'s state of mind, see Fed. R. Evid. 801(c); 2 ___ McCormack 269 at 208, or as falling within the declaration- _________ against-penal-interest exception to the hearsay rule, see ___ Fed. R. Evid. 804(b)(3). Trenkler argues that the admission of these statements violated his rights under the Confrontation Clause.26 We do not agree.  ____________________ 25. We agree with our dissenting brother that we may find an error harmless beyond a reasonable doubt only when the other evidence in the case, "standing alone, provides `overwhelming evidence' of the defendant's guilt." See infra at 53 ___ _____ (quoting Clark v. Morgan, 942 F.2d 24, 27 (1st Cir. 1991)). _____ ______ In contrast with our colleague, however, we believe that, when the evidence of Trenkler's participation in the Quincy bombing, which we do not believe was rendered inadmissible by the admission of the EXIS-derived evidence, is added to the "substantial" other evidence of Trenkler's guilt, the resulting sum is clearly "overwhelming." 26. We do not understand Trenkler to assert that the district court committed error under the Federal Rules of Evidence in admitting the statements. Though Trenkler does -42- 42 In asserting a Confrontation Clause violation, Trenkler relies primarily on Bruton v. United States, 391 ______ ______________ U.S. 123 (1968), in which the Supreme Court held that, in a joint trial, an instruction to the jury to disregard the confession of one non-testifying defendant was insufficient to prevent the confession from unfairly prejudicing the other defendant. Critical to the Bruton Court's decision was the ______ trial court's undisputed ruling that the confession was inadmissible against the non-confessing defendant. Id. at ___ 128 n.3. Bruton has no application in the present case, ______ however, because the challenged statements here were directly admissible against Trenkler and, consequently, did not pose the Bruton risk of spill-over prejudice. In this case, the ______ district court admitted the statements against Trenkler to establish the existence of the conspiracy.  The Confrontation Clause does not proscribe the use of all out-of-court statements. See Idaho v. Wright, 497 ___ _____ ______ U.S. 805, 813 (1990). In general, nonhearsay statements or statements not offered to prove the truth of the matter asserted do not raise Confrontation Clause concerns. Tennessee v. Street, 471 U.S. 409, 414 (1985); United States _________ ______ _____________ v. Levine, 5 F.3d 1100, 1107 (7th Cir. 1993), cert. denied, ______ _____ ______  ____________________ state at one point that the declarations "were erroneously admitted . . . as statements against Shay Jr.'s penal interest or of Shay Jr.'s state of mind," he does not explain this assertion of error except on constitutional grounds.  -43- 43 114 S. Ct. 1224 (1994). Moreover, the Confrontation Clause does not necessarily prohibit the use of hearsay statements where the trial court has admitted them pursuant to a "firmly-rooted" exception to the hearsay rule or has otherwise found the statements to possess "particularized guarantees of trustworthiness." See Wright, 497 U.S. at 816 ___ ______ (citing Ohio v. Roberts, 448 U.S. 56, 66 (1980)). ____ _______ To the extent that the district court admitted the statements as nonhearsay evidence, Trenkler's Confrontation Clause challenge lacks merit. See Street, 471 U.S. at 414. ___ ______ As for the rest, we have strongly suggested previously that the exception for declarations against penal interest is a "firmly rooted" exception to the hearsay rule. See United ___ ______ States v. Seeley, 892 F.2d 1, 2 (1st Cir. 1989) ("exception ______ ______ for declarations against penal interest would seem to be `firmly rooted'"). Trenkler does not challenge this assumption, nor does he explain why the statements in question lack "particularized guarantees of trustworthiness." Accordingly, we are not persuaded that the district court violated Trenkler's confrontation rights by admitting them. III. III. ____ Conclusion Conclusion __________ For the foregoing reasons, we affirm Trenkler's conviction. -44- 44 Dissent follows. Dissent follows. -45- 45 TORRUELLA, Chief Judge, (Dissenting). In my view, TORRUELLA, Chief Judge, (Dissenting). ___________ the erroneous admission in this case of evidence derived from the EXIS computer database violated the defendant's Sixth Amendment right to confront witnesses against him. Contrary to my brethren, I do not believe that this error was harmless beyond a reasonable doubt. I therefore dissent. I. I. __ Trenkler admitted to building a device that exploded in Quincy in 1986. The government's central strategy at trial27 was to prove that the Quincy device was so similar to the Roslindale bomb that they had to have been built by the same person. Stephen Scheid, an Intelligence Research Specialist with the Bureau of Alcohol, Tobacco and Firearms ("ATF"), testified that he conducted a computer query on the ATF's EXIS database28 to identify bomb incidents which shared certain characteristics with the Roslindale incident. Based on this analysis, Scheid told the jury that, out of the 14,252 bombings and attempted bombings reported in EXIS, only the Roslindale and the Quincy incidents shared all the queried characteristics. For a jury reviewing otherwise weak circumstantial evidence of defendant's guilt (see infra), this is powerful ___ _____  ____________________ 27. In support of its motion in limine to admit evidence of the 1986 incident, the government described this evidence as "the centerpiece of the Government's case in chief." 28. For a description of the EXIS database, see supra p. 8. _____ -46- 46 stuff -- tangible, "scientific" evidence which seems to conclusively establish that the same person who made the Quincy device in 1986 made the Roslindale bomb in 1991. Unfortunately, as the majority concedes, the reports from which the EXIS information is derived are utterly unreliable, thus rendering its conclusion equally unreliable, and, as will be shown, completely misleading. For three related reasons, I disagree with the majority's conclusion that admission of the EXIS-derived evidence was "harmless beyond a reasonable doubt." First, the EXIS-derived evidence plainly influenced the district court's decision to allow the government's motion to admit evidence of the Quincy incident, under Fed. R. Evid. 404(b), to show that the same person must have built the Roslindale bomb. Second, the EXIS-derived evidence was very powerful and very misleading. Third, the ____ ____ other evidence against Trenkler was not "overwhelming," as is required under our precedent. II. II. ___ The majority assumes, without deciding, that Trenkler's Sixth Amendment right to confront witnesses against him was violated by introduction of the EXIS-derived evidence. Supra n.22. As the majority recognizes, _____ constitutional cases are governed by a stringent harmless error analysis -- a conviction cannot stand unless the effect of the evidence is "harmless beyond a reasonable doubt." ____________________________________ -47- 47 Chapman v. California, 386 U.S. 18, 24 (1966) (emphasis _______ __________ added); United States v. De Jes s-R os, 990 F.2d 672, 678 ______________ _____________ (1st Cir. 1993).29 To comprehend why admission of the EXIS-derived evidence was not harmless beyond a reasonable doubt, one must understand the nature and extent of the constitutional violation. Because the majority barely acknowledges, much less discusses, the constitutional right at stake in this case, its result appears both analytically sound and benign. It is neither. I will therefore begin by explaining why, and to what extent, Trenkler's Sixth Amendment right to confront witnesses against him was violated. I will then endeavor to show why this error cannot be considered harmless. III. III. ____ The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Supreme Court has explained that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context  ____________________ 29. Under the standard for analyzing harmless error in a non-constitutional case, the court will uphold a conviction provided it can be said "that the judgement was not substantially swayed by the error." United States v. Flores, _____________ ______ 968 F.2d 1366, 1372 n.7 (1st Cir. 1992) (quoting Kotteakos v. _________ United States, 328 U.S. 750, 765 (1946)).  _____________ -48- 48 of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990); United States v. ________ _____ _____________ Zannino, 895 F.2d 1, 5 (1st Cir. 1990) ("the mission of the _______ Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that the trier of fact has a satisfactory basis for evaluating the truth of the prior statement") (quoting Dutton v. Evans, 400 U.S. 74, 89 (1970) (plurality ______ _____ opinion)). Hearsay evidence from an unavailable declarant30 may only be admitted against a defendant in a criminal case if the government can demonstrate that the proffered evidence "bears adequate indicia of reliability." Ohio v. Roberts, ____ _______ 448 U.S. 56, 66 (1980) (internal quotation marks omitted).31 The government may satisfy this burden by  ____________________ 30. For practical purposes, the authors of the over 14,000 underlying EXIS reports were effectively "unavailable" in this case. See United States v. Inadi, 475 U.S. 387, 394 ___ ______________ _____ (1986) (absolute unavailability not constitutionally required in all cases); Manocchio v. Moran, 919 F.2d 770, 774-76 (1st _________ _____ Cir. 1990) (same).  31. The majority properly holds that the EXIS-derived statement -- that out of more than 14,000 bombings and attempted bombings in the EXIS database only the Roslindale and Quincy incidents shared the specific queried characteristics -- is inadmissible totem pole hearsay. That is, it was based on a host of out-of-court statements (the 14,252 underlying reports submitted by unknown authors) offered in court for the truth of the matters asserted therein (the characteristics of those bombings). See Fed. R. ___ Evid. 801. Because we know neither who submitted those underlying reports, nor under what conditions, the majority properly holds that the statements do not satisfy any of the -49- 49 establishing either that the evidence "falls within a firmly rooted hearsay exception" or by showing that the evidence possesses "particularized guarantees of trustworthiness." Id.; accord Idaho v. Wright, 497 U.S. 805, 816-17 (1990) __ ______ _____ ______ (collecting cases); Manocchio, 919 F.2d at 773. The majority _________ properly holds that the EXIS-derived evidence satisfies neither of these criteria, but neglects to fully explain why. The critical inquiry for determining "particularized guarantees of trustworthiness" is whether "the test of cross-examination would be of marginal utility." Wright, 110 S. Ct. at 3149-50.32 The government in this ______ case, through Scheid, was permitted to introduce the statement that, out of 14,252 bombing and attempted bombing incidents in the EXIS database, only the Roslindale and Quincy incidents share the queried characteristics. The individuals who reported those bomb incidents were witnesses against Trenkler, each of them testifying, in effect: "This bomb incident had the following characteristics . . . ." Despite the importance of their "testimony," neither Trenkler nor the jury ever saw any of these witnesses. Trenkler's attorney was unable to cross-examine these witnesses with  ____________________ hearsay exceptions listed in Fed. R. Evid. 803(1)-(24).  32. The residual hearsay exception contained in Fed. R. Evid. 803(24), under which the EXIS evidence was admitted, is not a "firmly rooted hearsay exception." See Idaho v. ___ _____ Wright, 497 U.S. 805, 817 (1990); Government of Virgin ______ ______________________ Islands v. Joseph, 964 F.2d 1380, 1387 (3d Cir. 1992).  _______ ______ -50- 50 respect to their credibility and reliability. Because they were not subject to cross-examination, neither we nor the jury will ever know, for example, the answers to the following questions. Were the authors of these reports bomb experts? Were they even police officers? Did they follow certain procedures in compiling evidence? In filing their reports? What criteria did they use for determining that the device in question was a quote "bomb"? Did they even have first hand knowledge of the devices, or was the information provided to them second-hand from lay witnesses? Scheid did not know the answers to these questions, nor did he have first hand knowledge of the incidents themselves, supra p. _____ 34, thus making it impossible for Trenkler's attorney to effectively cross-examine him. Moreover, Scheid admitted that the bomb reports need not be signed, and that nothing ___________________ required the author of a submitted report to have personal knowledge of its contents.33 The majority also alludes to a potentially more pernicious problem concerning the EXIS-derived evidence. The majority notes that the database entry for the Roslindale incident lists approximately twenty-two characteristics  ____________________ 33. Even the majority questions the validity of the EXIS conclusion that only the Roslindale and Quincy devices share the same characteristics. As the majority points out, because we know absolutely nothing about how the underlying EXIS reports were generated, there is no way to know what the absence of an item at a bomb site means. Both Scheid and the government's explosives expert admitted as much. Supra n.21. _____ -51- 51 describing that incident, but Scheid, inexplicably, chose only to query ten of those characteristics.34 Supra n.21. _____ The majority notes that there is nothing to suggest that these ten characteristics are more important to a bomb- signature analysis than any of the other characteristics not chosen. Scheid offers no reason why he chose to query only certain generic characteristics instead of the more specific characteristics of the Roslindale bomb, which would be more evincing of a "signature." For example, the Quincy device would not have been a match if Scheid had queried any of the following characteristics of the Roslindale bombing: Futaba antenna, Rockstar detonator, use of dynamite, nails, glue, 6- volt battery, slide switch, paint, magazine page, or black electrical tape. The majority leaves the implication unspoken. I will not be so discreet. The obvious implication is that Scheid chose the particular characteristics in an attempt to find a match with the Quincy device. This implication is enforced by the fact that,  ____________________ 34. The queried characteristics were 1) bombings and attempted bombings; 2) involving cars or trucks; 3) with bomb placed under the car or truck; 4) using remote-control; and 5) magnets. EXIS listed seven incidents which included these characteristics. Scheid testified that he then performed a manual query of the seven incidents using other characteristics of the Roslindale bombing. He checked the other incidents to see if they involved 1) duct tape; 2) soldering; 3) AA batteries; 4) a toggle switch; and 5) round _____ magnets. Scheid did not check all 14,252 bombings and attempted bombings for these latter characteristics, only the seven.  -52- 52 according to Scheid's own testimony, the Quincy incident was not entered into the database until after the Roslindale _____ incident. That is, government agents brought the Quincy bombing to Scheid's attention when they asked him to investigate the Roslindale bombing.  The majority thinks these concerns go more to the weight of the evidence than to its admissibility; to the contrary, they go directly to the question of whether the evidence has particularized guarantees of trustworthiness under the Confrontation Clause. They demonstrate that it does not. Because the reports upon which the EXIS evidence is based are inherently and utterly unreliable, the EXIS evidence itself is inherently and utterly unreliable, and Trenkler's Sixth Amendment right to confront the witnesses against him was violated. See Wright, 497 U.S. at 805. The ___ ______ question then becomes whether this error was harmless beyond a reasonable doubt.35  ____________________ 35. This Circuit has demonstrated that it is not shy about applying the harmless error rule to sustain a criminal conviction, but rather, shows a persistent inclination to so rule. See, e.g., United States v. Romero-Carri n, 1995 WL ___ ____ ______________ ______________ 258843 (1st Cir.); United States v. Cotal-Crespo, 47 F.3d 1 _____________ ____________ (1st Cir. 1995); United States v. Smith, 46 F.3d 1223 (1st _____________ _____ Cir. 1995); United States v. Lewis, 40 F.3d 1325 (1st Cir. _____________ _____ 1994); United States v. Tuesta-Toro, 29 F.3d 771 (1st Cir. _____________ ___________ 1994); Singleton v. United States, 26 F.3d 233 (1st Cir. _________ ______________ 1994); United States v. Isaacs, 14 F.3d 106 (1st Cir. 1994); _____________ ______ United States v. Welch; 15 F.3d 1202 (1st Cir. 1993); United ______________ _____ ______ States v. Sep lveda, 15 F.3d 1161 (1st Cir. 1993); United ______ _________ ______ States v. Innamorati, 996 F.2d 456 (1st Cir. 1993); United ______ __________ ______ States v. Williams, 985 F.2d 634 (1st Cir. 1993); United ______ ________ ______ States v. Spinosa, 982 F.2d 620 (1st Cir. 1992); United ______ _______ ______ -53- 53 IV. IV. ___ Under the harmless beyond a reasonable doubt standard, we must vacate the conviction if there is "some reasonable possibility that error of constitutional dimension ______________________ influenced the jury in reaching [its] verdict." United States __________ _____________ v. Majaj, 947 F.2d 520, 526 n.8 (1st Cir. 1991) (emphasis _____ added) (quoting United States v. Argentine, 814 F.2d 783, 789 _____________ _________ (1st Cir. 1987)). See also United States v. Flores, 968 F.2d ________ _____________ ______ 1366, 1372 (1st Cir. 1992). Under this standard, we will only find harmless error when the untainted evidence, standing alone, provides "overwhelming evidence" of the defendant's guilt. Clark v. Moran, 942 F.2d 24, 27 (1st Cir. _____ _____ 1991). In conducting this inquiry, we "must consider the evidence as a whole, weighing the effect of the tainted evidence against the effect of that evidence which was properly admitted." Id. (citing Lacy v. Gardino, 791 F.2d __ ____ _______ 980, 986 (1st Cir.), cert. denied, 479 U.S. 888 (1986)). _____________ Thus, the relative strength of the tainted evidence -- i.e.,  ____________________ States v. Figueroa, 976 F.2d 1446 (1st Cir. 1992); United ______ ________ ______ States v. Tejeda, 974 F.2d 210 (1st Cir. 1992); United States ______ ______ _____________ v. Parent, 954 F.2d 23 (1st Cir. 1992); United States v. ______ ______________ Karas, 950 F.2d 31 (1st Cir. 1991); United States v. Minnick, _____ _____________ _______ 949 F.2d 8 (1st Cir. 1991); United States v. Maraj, 947 F.2d _____________ _____ 520 (1st Cir. 1991); Clark v. Moran, 942 F.2d 24 (1st Cir. _____ _____ 1991); United States v. McMahon, 938 F.2d 1501 (1991); United _____________ _______ ______ States v. Brown, 938 F.2d 1482 (1st Cir. 1991); United States ______ _____ _____________ v. Ellis, 935 F.2d 385 (1st cir. 1991); United States v. _____ ______________ Sutherland, 929 F.2d 765 (1st Cir. 1991); United States v. __________ ______________ Wood, 924 F.2d 399 (1st Cir. 1991); United States v. Paiva, ____ _____________ _____ 892 F.2d 148 (1st Cir. 1989).  -54- 54 its potential effect on the jury -- is a highly significant consideration. As I see it, there are three related reasons why admission of the EXIS evidence cannot be considered harmless beyond a reasonable doubt. First, it is clear to me that the district court relied on the improper EXIS evidence in its decision to allow the government to present evidence of the Quincy incident to the jury to prove identity under Rule 404(b). At the hearing on its motion in limine to admit evidence of the Quincy incident under Fed. R. Evid. 404(b), the government presented the testimony of Scheid, regarding the EXIS computer analysis, and the testimony of the government's bomb expert, Waskom, who testified that, in his opinion, the Quincy and Roslindale devices were so similar that they must have been built by the same person. In turn, Trenkler presented expert testimony that the devices were too different for anyone to be able to determine if they were built by the same person. After hearing this evidence, the district court concluded that "the similarities [between the two incidents] are sufficient to admit the evidence under the rules established . . . by the First Circuit." The majority states that, based upon its review of the record, it is convinced that the EXIS-based evidence "was not a critical factor in the district court's decision to -55- 55 admit the Quincy bomb evidence for purposes of identity. The EXIS-derived evidence was merely cumulative, corroborating the testimony of the government's explosives expert." Supra _____ pp. 39-40. Yet the record demonstrates that the district court judge thought otherwise when she decided to admit evidence of the 1986 Quincy incident. In her oral opinion on the government's motion, the district court judge began by summarizing the testimony of Waskom, and then stated: "Adding ______ to this evidence, the statistical evidence from the EXIS _________________ system, I am persuaded that the two devices are sufficiently similar to prove that the same person built them, and thus relevant to the issues in this case." (emphasis added). The district court judge did not say that the EXIS evidence "corroborated" Waskom's testimony. She stated that, when she adds the EXIS evidence to Waskom's testimony, she becomes ____ convinced that the two devices are sufficiently similar. It is plain that the district court judge relied on the EXIS evidence to form the critical final link between the two devices. Indeed, in arguing its motion, the government chose to first present the EXIS evidence and then to present the Waskom testimony, suggesting that it intended the latter to corroborate the former. The district court's erroneous determination that the EXIS evidence was admissible led not only to the jury hearing that evidence, but also to the jury hearing Waskom's testimony with respect to the two incidents. -56- 56 I cannot agree, therefore, that admission of this evidence was harmless beyond a reasonable doubt. The second reason that admission of the EXIS evidence cannot be considered harmless is that this type of "scientific" evidence is too misleading, too powerful, and has too great a potential impact on lay jurors, to be disregarded as harmless. The EXIS-derived evidence was, in the best case scenario, unintentionally misleading, and, in the worst case scenario, deliberately skewed. Scheid testified that, in entering information about the Quincy incident into the EXIS database, he relied solely on a laboratory report prepared in 1986 by investigators from the Massachusetts Department of Public Safety. This report does not state that the Quincy device was attached to the underside of the Capeway truck. Rather, it refers only to an "[e]xplosion on truck." Somebody must have given Scheid further information about the Quincy explosion because he entered "under vehicle" as a characteristic of the Quincy incident. The majority acknowledges these facts but, inexplicably, makes no comment. See supra n.8. These facts are important for three reasons. ___ _____ First, they illustrate the fallibility of the underlying reports. How many of the other 14,232 reports had similar defects? Second, they illustrate how easily one wrong or incomplete entry can affect a query result. If Scheid had -57- 57 actually followed the report, the Quincy incident would not have matched the Roslindale bombing because Scheid's query entry was for a bomb "under vehicle."36 Finally, these facts indicate that the EXIS test was skewed (whether intentionally or unintentionally) to find a match between the Quincy and Roslindale incidents.37 The EXIS-derived evidence is also misleading because it focuses the jury's attention on the trees instead of the forest. By focusing on similar minor aspects between the two devices -- e.g., duct tape, magnets and soldering -- the majority completely brushes aside the fact that the central and most important ingredient in the two devices is fundamentally different. The central ingredient in a bomb, one would think, is the explosive content (in much the same way that the central ingredient in a high-performance car is the engine). The Roslindale bomb used two to three sticks of dynamite -- a very powerful explosive. The Quincy device ________ used an M-21 Hoffman artillery simulator, which is a device  ____________________ 36. The majority acknowledges that "[t]he statement that out of more than 14,000 bombing and attempted bombing incidents in the EXIS database only the Roslindale and Quincy incidents share the eight specific queried characteristics (bombings and attempted bombings, attached under car or truck, remote- control, round magnets, duct tape, solder, AA batteries, toggle switches) is a fairly powerful statement, but perhaps _________________________________________ a somewhat misleading one." Supra n.21 (emphasis added). _________________________ _____ 37. As discussed previously, there is other evidence (i.e., the suspect nature of Scheid's query choices) which tends to show that the EXIS query may have been skewed to reach a predictable result. See supra pp. 50-51.  ___ _____ -58- 58 used by the military to simulate, in a safe fashion, the _________________________________ flash and noise of artillery. The simulator is, in effect, a firecracker-like device; it has no where near the strength of dynamite. In stark contrast to dynamite, a simulator is not designed to cause physical or property damage. Indeed, while the Roslindale device created an explosion large enough to kill, the Quincy device caused no visible damage to the truck it was placed under. Equating the two devices is like equating a BB gun with a high caliber rifle.38 The misleading nature of the EXIS-derived statement is compounded by the nature of its source, and the way in which it was presented to the jury. Not only is it rank hearsay evidence, it is hearsay evidence wrapped in a shroud of "scientific" authenticity. This is not a paid government expert testifying that, in his opinion, the two devices were ______________ built by the same person; this is a computer declaring that ________ the two devices were built by the same person. Computers deal in facts,39 not opinions. Computers are not paid by  ____________________ 38. Federal authorities apparently did not deem the Quincy incident serious enough to warrant bringing charges against Trenkler pursuant to 18 U.S.C. 844(i) (malicious destruction of property by means of an explosive), one of the statutes at issue in this case. State charges stemming from the Quincy incident were dismissed. 39. Of course, the facts generated by the computer are only as accurate and reliable as the facts fed into it by its operator. As the majority recognizes, in this case the facts fed into the computer were, unbeknownst to the jury, manifestly unreliable. Thus, its conclusion based on those facts is similarly unreliable. -59- 59 one side to testify. Computers do not have prejudices. And computers are not subject to cross-examination. Moreover, the chart of the EXIS queries performed by Scheid, and the printouts of the results of those queries, were introduced into evidence and presented as exhibits to the jury. Consequently, the jury had this misleading, physical evidence with them in the jury room during deliberations.40 Does it not stand to reason that the lay juror will accord greater weight to a computer's written findings than to the testimony of a government expert witness? The common-sense answer is, of course.41  ____________________ 40. Common sense tells us that lay jurors often will lend more weight to tangible evidence than to oral testimony. See ___ generally 22 C. Wright & Graham, Federal Practice and _________ ______________________ Procedure, 5173 (1978) ("It is often asserted that the _________ psychological impact of the concrete has a capacity to suggest matters not proved, to lead the jury to draw unconscious inferences that would not be drawn if the object was the subject of testimony rather than being produced in court.") (internal citations omitted). See also People v. ___ ____ ______ Moore, 525 N.E.2d 460, 463 (N.Y. 1988) (Kaye, J., dissenting) _____ ("No point in a trial can be more critical than jury deliberations. Materials taken into the jury room at those crucial moments may well influence the verdict."). 41. As one commentator has noted: Scientific evidence impresses lay jurors. They tend to assume it is more accurate and objective than lay testimony. A juror who thinks of scientific evidence visualizes instruments capable of amazingly precise measurement, of findings arrived at by dispassionate scientific tests. In short, in the mind of the -60- 60 The majority decision in this case not only defies common sense, it is also contrary to our precedent. In De __ Jes s-R os, 990 F.2d 672, we held that the defendant's due __________ process rights were violated when the district court admitted certain identification testimony by a witness. Significantly, we concluded that the error was not harmless beyond a reasonable doubt, even though another witness testified at trial that he also had identified the defendant. Rather than concluding, as the majority does here, that the one erroneously admitted identification was "merely cumulative" of the other, the court reasoned: [T]here is no way for us to discern the role that Rivera's identification played in the jury's deliberations. We are concerned that the jury may have been ______________ persuaded to convict by the very fact _________________________________________ that there were two witnesses who ____________________________________ identified [the defendant]. It is also possible that the jury relied solely upon the testimony of Rivera in reaching its  ____________________ typical lay juror, a scientific witness has a special aura of credibility. Imwinkelried, Evidence Law and Tactics for the Proponents of _______________________________________________ Scientific Evidence, In Scientific and Expert Evidence 33, 37 ______________________________________________________ (E. Imwinkelried ed. 1981). See also Giannelli, The _________ ___ Admissibility of Novel Scientific evidence: Frye v. United _____________________________________________ States, a Half-Century Later, 80 Colum. L. Rev. 1197, 1237 _____________________ (1980) ("The major danger of scientific evidence is its potential to mislead the jury; an aura of scientific infallibility may shroud the evidence and thus lead the jury to accept it without critical scrutiny."); 22 C. Wright & Graham, supra note 41, 5217 ("Scientific . . . evidence has _____ great potential for misleading the jury. The low probative worth can often be concealed in the jargon of some expert . . ."). -61- 61 conclusion. Thus, we find reasonable doubt exists as to whether the jury would have convicted [the defendant] based solely upon Mejias's identification testimony. Id. at 678 (emphasis added). Is it not equally plausible __ that the jury in this case "may have been persuaded to convict" by the very fact that two "witnesses" -- Waskom and the EXIS-derived evidence -- identified the builder of the Quincy device as the builder of the Roslindale bomb? Is it not also equally plausible that the jury relied solely upon ______ the EXIS-derived evidence in reaching its conclusion? Because the EXIS-derived statement came from a computer, and was presented in tangible, exhibit form, it is more powerful and seemingly credible evidence to a lay jury than the testimony of a human being. The jury may well have relied on the EXIS-derived evidence to break the tie between the competing experts. This is particularly so since, as the trial judge noted, defendant's expert witness had "considerably more experience in making . . . signature comparisons." Since the EXIS-derived evidence could well have been "the clincher" for the jury, it cannot be considered harmless beyond a reasonable doubt. See Coppola ___ _______ v. Powell, 878 F.2d 1562 (1st Cir. 1989). ______ The third reason that admission of the EXIS evidence is not harmless beyond a reasonable doubt is that the other evidence against Trenkler was not "overwhelming." -62- 62 See Clark, 942 F.2d at 27. The majority points to a ___ _____ conglomeration of other testimony in support of its conclusion that there was "substantial evidence" of Trenkler's guilt, independent of the Quincy incident. The test, of course, is not whether there is "substantial evidence" of Trenkler's guilt but whether there is "overwhelming evidence" of Trenkler's guilt. The two ____________ standards are qualitatively and quantitatively different. In any case, I will begin by addressing Trenkler's "statements" to government agents. ATF Agent D'Ambrosio testified that he asked Trenkler to draw a sketch of the Quincy device, which Trenkler did. D'Ambrosio then told Trenkler that the Roslindale bomb also used remote control, but that, rather than a firecracker type device, it used dynamite. D'Ambrosio asked Trenkler how, in light of these facts, the wiring diagram he had just drawn for the Quincy device would have been different for the Roslindale bomb. D'Ambrosio testified that Trenkler then drew a diagram which showed two blasting caps inserted into two sticks of dynamite. The majority considers this significant evidence of Trenkler's guilt because the fact that the Roslindale bomb used blasting caps had not been publicly disclosed. The majority fails to note, however, that D'Ambrosio actually testified that at least two ________ blasting caps were used in the Roslindale bombing. Thus, -63- 63 Trenkler's drawing of only two blasting caps was not an exact match. Moreover, the jury heard evidence that Trenkler had extensive knowledge of both electronics and explosives, so it is not necessarily significant that Trenkler was able to reconstruct an aspect of the Roslindale bomb, particularly considering the information concerning the bomb provided to Trenkler by D'Ambrosio. Trenkler merely identified that blasting caps were a likely way in which a bomb of this size and power would be constructed. In the absence of any testimony that the use of blasting caps is unusual or unique (a proposition which is highly unlikely), the jury could only speculate as to the significance of the drawing. The majority also finds significance in ATF Agent Leahy's testimony that Trenkler said to him: "If we did it, then only we know about it . . . how will you ever find out . . . if neither one of us talk[]?" The majority paints this statement in a confessional light. This testimony may or may not have been of some circumstantial relevance to the jury (although standing alone, of course, it would not be sufficient to sustain a conviction). But, upon review, when the court is looking for "overwhelming evidence of guilt," one would think the court would not have to resort to this sort of an ambiguous, taunting statement.42 Similarly, the  ____________________ 42. In Coppola, for example, we lent little weight to _______ defendant's statement to another inmate -- "What did I have to lose?" -- in response to a question whether he had -64- 64 court notes that there was evidence that Trenkler and Shay knew each other, and that Trenkler had knowledge of both electronics and explosives. While the jury might consider this type of circumstantial evidence relevant, it can hardly be said that it does much in the way of providing "overwhelming evidence" of defendant's guilt. Cf. United __ ______ States v. Innamorati, 996 F.2d 456, 476 (1st Cir. 1993) ______ __________ (holding that the erroneous admission of inculpatory grand jury testimony was harmless beyond a reasonable doubt when seven people testified at trial that defendant was engaged in _____ marijuana and cocaine dealing, and drugs and money were found in defendant's constructive possession). The majority relies most heavily on the testimony of David Lindholm, who testified that Trenkler confessed to building the Roslindale bomb. But Lindholm had some serious credibility problems which make his testimony "shaky," to say the least. Lindholm testified that he met Trenkler while Lindholm was serving a 97-month sentence for conspiracy to distribute marijuana and tax evasion. He further testified that he was in the marijuana business from approximately 1969 through 1988, and that he did not pay any income taxes during that time. Lindholm also testified that, in order to secure bank loans to purchase property during that period, he showed several banks false income tax returns. On the basis of  ____________________ committed the rape. See 878 F.2d at 1569-70.  ___ -65- 65 Lindholm's shady past alone, the jury might have completely disregarded his testimony. But Lindholm also had some less obvious credibility problems. The circumstances of his meeting Trenkler strike me as a little too coincidental. On December 17, 1992, after a year and a half incarceration in Texas, Lindholm is brought back to Boston concerning certain unspecified charges related to his conviction. He is then placed in the orientation unit at the Plymouth House of Correction where he meets Alfred Trenkler, who is being held in connection with the Roslindale bombing. The two subsequently discover that they have an extraordinary amount in common. First, they are both from the town of Milton, Massachusetts. Second, Trenkler attended Thayer Academy and Milton Academy, and Lindholm's father also attended Thayer Academy and Milton Academy. Third, they both lived for a time -- overlapping by one year -- on White Lawn Avenue in Milton. Based on these commonalities, and Lindholm's generosity in sharing his knowledge of the criminal justice system with Trenkler, they form a friendship. Trenkler then, allegedly, confesses to Lindholm that he built the bomb. In my view, a reasonable juror might question whether Lindholm was placed in the orientation unit by the government for the purpose of obtaining a confession from Trenkler. If so, that juror would likely wonder what -66- 66 Lindholm got in return. Not surprisingly, Lindholm testified that he had no agreements with the government and that he did not receive any promises or inducements for his testimony.43 He did testify on cross-examination, however, that he knew, when he provided the information about Trenkler to the government, that the only way his 97-month sentence could be reduced was if he supplied new information to the government.44 We do not know how much weight the jury gave Lindholm's testimony, but we do know that, at least on paper -- for we did not observe his demeanor at trial -- Lindholm  ____________________ 43. If the government makes an explicit promise to a witness, of course, this will come out at trial and likely decrease the witness's credibility in the eyes of the jury. But if the government lawyers explain to the witness why they do not want to make any explicit promises, leaving the inference that one good deed begets another, the witness can testify that he has no agreement. I note, in this regard, that this court has previously questioned the validity of these "no agreement" statements by criminal defendants. See, ___ e.g., Coppola, 878 F.2d at 1569-70. ____ _______ 44. When asked on direct examination why he testified, Lindholm stated: Since I have been incarcerated, I have come to realize that the sole function of prison is not just punishment. I think rehabilitation is important for an individual. And I think, when I talk about rehabilitation, I mean rehabilitation of a person's values in terms of how they live one's life and the decisions they make, knowing the decisions they make, knowing the difference between what's wrong and what's right, what's illegal and legal.  -67- 67 had some significant credibility problems. Consequently, I cannot conclude beyond a reasonable doubt that the jury would have believed his testimony; particularly in a case such as this where there is absolutely no physical evidence tying _________________________________ Trenkler to the bombing. Cf. Coppola, 878 F.2d at 1571 __ _______ (discounting inculpatory testimony of three jail inmates because it "raises serious questions of credibility" and noting the absence of any conclusive physical evidence tying the defendant to the crime). The only evidence coming near thatlevelofreliability wastheimproperlyadmitted EXISevidence. Absent the EXIS-derived evidence, the government's case against Trenkler consists of a smorgasbord of inconclusive circumstantial evidence and an inherently unreliable alleged jailhouse confession. Faced with this sort of evidence, a reasonable jury would probably look for some sort of tangible evidence upon which to hang its hat. The EXIS-derived evidence was just that. Because it was the only ostensibly conclusive evidence tying Trenkler to the crime, it may have been the clincher for the jury. See ___ Coppola, 878 F.2d at 1571. It was therefore not harmless _______ beyond a reasonable doubt. V. V. __ A horrible crime was committed in which one police officer was killed and another seriously injured. Society rightfully demands that the guilty be apprehended, tried, and -68- 68 punished. But the distinguishing feature of our legal system is that even those charged with grotesque crimes are guaranteed certain constitutional rights intended to ensure that they receive a fair trial. Unfortunately, and with all due respect to my brethren, I believe the defendant's right to a fair trial was violated when the government was permitted to introduce the highly prejudicial evidence derived from the EXIS computer database. Because this error so severely violated defendant's Sixth Amendment right to confront the witnesses against him, and because the remainder of the evidence against him was not "overwhelming," I dissent. -69- 69